CMEM, INC., ET AL., Petitioners [1] v. COMMISSIONER OF INTERNAL REVENUE, Respondent CMEM, Inc. v. Commissioner
Docket Nos. 1667-88, 1548-89, 13579-89
United States Tax Court
T.C. Memo 1993-520; 1993 Tax Ct. Memo LEXIS 531; 66 T.C.M. (CCH) 1241; November 15, 1993, Filed *531 The T family owned C corporation whose primary asset was a diner. Using the bank deposits and cash expenditures method of reconstructing income, R determined unreported income against the Ts. R also determined that the bulk of such income constituted constructive dividends from C, generated by unreported net sales of the diner. The respective cases of the Ts and C were consolidated for trial. 1. Held: Respondent's deficiency determinations against the Theodoulous and CMEM, Inc. (CMEM), were not arbitrary. 2. Held, further, respondent has met her burden of proving, as alleged in her posttrial amended answer, that the Theodoulous had unreported rental income for their 1982 through 1984 taxable years. 3. Held, further, respondent has met her burden of proving, as alleged in her posttrial amended answer, that the Theodoulous had unreported interest income on foreign bank deposits for their 1983 and 1984 taxable years. 4. Held, further, domestic interest income, the majority of which was earned on savings accounts established in the names of the Theodoulous' minor children, was taxable to the Theodoulous for their 1982 through 1984 taxable *532 years. 5. Held, further, deposits to the Theodoulous' personal accounts of tax refund and insurance proceed checks due CMEM constitute constructive dividends to the Theodoulous in the amount of $ 19,940 for their 1982 taxable year. 6. Held, further, the Theodoulous had additional unreported income in the amount of approximately $ 347,000 for their 1983 and 1984 taxable years as determined by the bank deposits and cash expenditures method of proof. 7. Held, further, respondent properly disallowed itemized deductions for charitable contributions claimed by the Theodoulous for their 1983 and 1984 taxable years. 8. Held, further, respondent improperly reduced the Theodoulous' rental deductions for their 1983 and 1984 taxable years. 9. Held, further, additions to tax under sec. 6653(b)(1) and (2), I.R.C., are sustained against Michael Theodoulou for his 1982 through 1984 taxable years. 10. Held, further, additions to tax under sec. 6661, I.R.C., are sustained against the Theodoulous for their 1982 through 1984 taxable years. 11. Held, further, the statute of limitations otherwise barring collection of deficiencies *533 and additions to tax against the Theodoulous for their 1982 through 1984 taxable years is extended by sec. 6501(c), I.R.C.
12. Held, further, Evangelia Theodoulou does not qualify for innocent spouse treatment within the terms of sec. 6013(e), I.R.C.
13. Held, further, respondent's deficiency determinations against CMEM, based on unreported net sales in the amount of approximately $ 347,000, are sustained for its 1983 through 1985 taxable years. 14. Held, further, CMEM's claimed rental deductions for its 1982 through 1985 taxable years are upheld. 15. Held, further, respondent has met her burden of proving, as alleged in her posttrial amended answer, that CMEM had an additional $ 15,000 of income for its 1983 taxable year on account of unreported vending machine commissions. 16. Held, further, additions to tax under sec. 6653(b)(1) and (2), I.R.C., are sustained against CMEM for its 1983 through 1985 taxable years. 17. Held, further, additions to tax under sec. 6661, I.R.C., are sustained against CMEM for its 1983 through 1985 taxable years. 18. Held, further, the statute of limitations otherwise barring *534 collection of deficiencies and additions to tax against CMEM for its 1983 taxable year is extended by sec. 6501(c), I.R.C.
For petitioners: Herbert L. Zuckerman, Robert J. Alter, and Richard J. Sapinski. For respondent: Curt M. Rubin, Suzanne L. Corbin, and Arnold J. Gould. HALPERN
HALPERN
MEMORANDUM FINDINGS OF FACT AND OPINION HALPERN, Judge: By separate notices of deficiency, respondent determined deficiencies and additions to tax against petitioners as follows: Michael and Evangelia Theodoulou Date of
Additions to Tax
Deficiency
Sec. Sec.
Tax Year
Notice
Deficiency
[1] 6653(b)(1) 6661
1982
5/24/89
$ 111,512
$ 55,756
$ 27,878
1983
5/24/89
108,698
54,349
27,175
1984
5/24/89
189,491
94,746
47,373
CMEM, Inc.
Date of
Additions to Tax
Deficiency
Sec. Sec.
Tax Year
Notice
Deficiency
[2] 6653(b)(1) 6661
9/30/82
5/24/89
$ 88,820 $ 44,410
--  9/30/83
5/24/89
127,266
63,633
$ 31,817
9/30/84
12/14/87
162,262
81,131
40,565
9/30/85
12/14/88
44,912
22,456
11,228
*535 Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. By pretrial amended answer, respondent determined an increase in deficiency in the amount of $ 24,299 against petitioner CMEM, Inc. (CMEM), for its 1984 taxable year. By posttrial amended answer, respondent determined unspecified increased deficiencies and section 6653(b) and section 6661 additions to tax against CMEM for its 1983 taxable year on account of allegedly unreported vending machine income in the amount of $ 15,000. In that same posttrial amended answer, respondent determined increased deficiencies and section 6661 additions to tax against petitioners Michael and Evangelia Theodoulou (collectively, the Theodoulous, individually, Michael or Evangelia) and increased section 6653(b) additions to tax against Michael based on alleged unreported rental and interest income earned in 1982 through 1984. After concessions by the parties, the issues remaining for decision in these consolidated cases are: (1) Whether respondent's deficiency determinations against the Theodoulous *536 and CMEM were arbitrary, (2) whether respondent has met her burden of proving that the Theodoulous had unreported rental income for their 1982 through 1984 taxable years as alleged in her posttrial amended answer, (3) whether respondent has met her burden of proving that the Theodoulous had unreported interest income on foreign bank deposits for their 1983 and 1984 taxable years as alleged in her posttrial amended answer, (4) whether unreported domestic interest income, the majority of which was earned on savings accounts established in the names of the Theodoulous' minor children, during their 1982 through 1984 taxable years, is taxable to the Theodoulous, (5) whether deposits to the Theodoulous' personal accounts of tax refund and insurance proceeds checks due CMEM constitute constructive dividends to the Theodoulous for their 1982 taxable year, (6) whether the Theodoulous had additional unreported income for their 1982 through 1984 taxable years as determined by the bank deposits and cash expenditures method of reconstructing income, (7) whether respondent properly disallowed itemized deductions for charitable contributions claimed by the Theodoulous for their 1983 and 1984 taxable *537 years, (8) whether respondent properly reduced the Theodoulous' rental income for their 1983 and 1984 taxable years, (9) whether Michael is subject to section 6653(b)(1) and (2) additions to tax for his 1982 through 1984 taxable years, (10) whether the Theodoulous are subject to section 6661 additions to tax for their 1982 through 1984 taxable years, (11) whether the statute of limitations barring collection of deficiencies and additions to tax against the Theodoulous for their 1982 through 1984 taxable years is extended by either section 6501(c) or (e), (12) whether Evangelia qualifies for innocent spouse relief under section 6013(e) for the Theodoulous' 1982 through 1984 taxable years, (13) whether CMEM had income from unreported net sales in the amounts determined by respondent for its 1982 though 1985 taxable years, (14) whether respondent properly disallowed CMEM's claimed rental deductions for its 1982 through 1985 taxable years, (15) whether respondent has met her burden of proving that CMEM had unreported income from vending machine commissions in its 1983 taxable years as alleged in her posttrial amended answer, (16) whether CMEM is subject to section 6653(b)(1) and (2) additions *538 to tax for its 1982 through 1985 taxable years, (17) whether CMEM is subject to section 6661 additions to tax for its 1983 through 1985 taxable years, and (18) whether the statute of limitations barring collection of deficiencies and additions to tax against CMEM for its 1982 and 1983 taxable years is extended by either section 6501(c) or (e). FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulations of facts filed by the parties and attached exhibits are incorporated herein by this reference. Also incorporated herein are the findings of fact made in our opinion in CMEM, Inc. v. Commissioner, T.C. Memo. 1991-467, which dealt with various discovery issues arising in the instant case. At the time the Theodoulous filed their petition in the instant case they resided on Staten Island, in New York City. The Theodoulous are husband and wife, who, for each of the years in issue, made a joint return of income, computed on the basis of a calendar year. When CMEM filed its petitions in the instant case, its principal place of business also was on Staten Island, in New York City. For the years in issue, CMEM made a return *539 on the basis of a fiscal year ending on September 30. During the years in issue, Michael was the sole shareholder of CMEM. The primary business of CMEM, during those years, was the operation of a restaurant called the Golden Dove Diner (Golden Dove), also located on Staten Island. 1. The Theodoulous
Michael was born in Voroklini, Cyprus, on April 15, 1937. He graduated high school in Cyprus. In 1961, he came to live in the U.S. He obtained work in restaurants. During the 1960's, Michael made annual trips to visit his family in Cyprus. On one of those trips, in 1965, Michael met and married his wife, Evangelia. The Theodoulous have two children, Eleada and Elenodoros, born in 1969 and 1974, respectively. 2. Michael's Background in Diner Operations
For a short period, in late 1978 and early 1979, Michael owned an interest in a corporation that operated the Derby Diner, in Carlstadt, New Jersey. After selling that interest, Michael worked as a manager at a second diner, where he met Chris Meitanis (Meitanis). Meitanis also is from Cyprus. He also had previously owned a diner. The two decided to open a diner of their own, and ultimately settled on an existing *540 diner located on Staten Island. 3. The Deppe Diner
The Staten Island diner was owned by a family named Deppe. It had been constructed for the Deppes by DeRaffele Manufacturing Corp. (DMC), and had opened for business in 1978. The Deppes did not make a success of the diner, however, and, it soon closed. The Deppes surrendered possession to DMC in exchange for a release from liability for the remaining purchase price. Through a corporation known as 3281 Realty Corp., the Deppes retained the land on which the diner was located. 4. Formation of CMEM
CMEM was organized to acquire and operate the Deppe Diner. From CMEM's inception in 1980 to approximately January 1982, Michael owned 83 percent and Meitanis owned 17 percent of CMEM's stock. Thereafter, and for all years in issue, Michael owned 100 percent of CMEM. 5. Acquisition of the Golden Dove
On October 22, 1980, CMEM purchased the Deppe diner from DMC for a total price of $ 802,954. CMEM made a downpayment of $ 60,800, with the $ 742,154 balance payable over 67 months. 6. Rental of the Land Underlying the Diner
At the same time, CMEM also entered into a 35-year lease with 3281 Realty Corp., with respect *541 to the land underlying the diner. The lease called for a $ 60,000 downpayment and monthly payments of $ 3,000 over the next 46 months, with smaller amounts due thereafter. Certain other liabilities were assumed. In October 1982, Michael purchased the land underlying the Golden Dove from 3281 Realty Corp. During the years here in issue, CMEM made rental payments, first to 3281 Realty Corp. (until October 1982), and thereafter to Michael. CMEM's rental payments were $ 33,000, $ 34,500, $ 37,500, and $ 15,000, respectively, for its 1982 through 1985 taxable years. 7. The Golden Dove's Facilities
The Golden Dove seats approximately 225 people in two seating areas and at a counter. It has a service bar from which liquor is served to customers with their meals, but it does not have seating or cocktail service at the bar. The Golden Dove does not provide any catering or banquet services. After CMEM opened the Golden Dove in late October 1980, at least five members of Michael's family, including his wife and daughter, were regularly employed at the Golden Dove. 8. The Golden Dove's Financial Operations
Most of the Golden Dove's financial operations, including payment *542 of vendors and payroll, were carried on in cash. In early 1982, Michael hired Bernard Reis (Reis), a certified public accountant, to help keep track of the Golden Dove's finances and to perform other accounting duties. The Golden Dove's gross receipts were determined on a monthly basis by adding together (1) deposits to the corporate checking account, (2) cash payroll, and (3) cash disbursements for merchandise and supplies. For purposes of that determination, Michael would inform Reis orally of the Golden Dove's aggregate cash purchases for the month. During the years in issue, Reis prepared the Federal tax returns of both CMEM and the Theodoulous. CMEM's average weekly gross sales, as reported on its tax returns, for taxable years 1982 through 1985 were $ 10,933, $ 14,292, $ 12,880 and $ 15,471, respectively. Actually, the Golden Dove had, as a minimum, average weekly gross sales for its 1982 through 1985 taxable years as follows: Table 1 Year
Sales
1982
$ 10,933
1983
15,282
1984
22,050
1985
18,155
9. Loans from Vendors and Suppliers
Beginning in 1981, and continuing during the years in issue, various vending machines were installed on the premises *543 of the Golden Dove by La Morte's Cigarette and Music Service, Inc. (La Morte's), which paid a commission based on a percentage of the vending machine receipts. In 1982, Michael received a $ 15,000 interest-free loan from La Morte's. That loan was repaid by CMEM out of the commissions earned on the vending machines during the period from November 12, 1982, through May 6, 1983. In 1982, Michael also received a loan of $ 15,000 from Coffee Associates, a coffee supplier. 10. The Theodoulous' Cash on Hand
In a December 24, 1980, financial statement, filed with the New York State Liquor Authority, Michael showed a $ 22,204 bank deposit as his only liquid asset. The Theodoulous had on hand liquid assets not in excess of $ 22,204 at the close of both 1980 and 1981. They had on hand cash not in excess of $ 40,022 at the close of 1982. 11. Cash Withdrawals--Application of Proceeds
During 1982, the Theodoulous withdrew from their accounts at a local bank, Northfield Savings Bank (NSB), $ 61,011 in cash, the disposition of which is uncertain. In 1983, the Theodoulous withdrew from NSB $ 13,025 in cash, the disposition of which also is uncertain. Such sums were either expended *544 for living expenditures of the Theodoulous, used to purchase wire transfers or cashier's checks, or redeposited. 12. The Theodoulous Foreign and Domestic Rental Activity
During the years at issue, Michael and Evangelia owned property in Voroklini, Cyprus, on which was located a hotel and restaurant (the hotel property). The hotel property was leased to others, and, during 1982, 1983, and 1984 Michael and Evangelia received the following gross rental income: Table 2 Hotel Property Gross Income
1982
$ 16,458
1983
14,820
1984
13,240
Michael and Evangelia also received gross rental income of $ 500 a month during each of 1982, 1983, and 1984 from the rental of a room in their Staten Island, New York, residence. Their annual gross income from such rental was as follows: Table 3
Residence Gross Income
1982
$ 6,000
1983
6,000
1984
6,000
13. The Theodoulous' Banking Activities
During the years in issue, the Theodoulous opened and closed at least 18 different bank accounts at NSB, in their own names or in the names of their children (Eleada and Elenodoros). Deposits to those accounts were at least in the amounts shown in the following table: *545 Table 4 Gross Deposits
NSB Acct. No.
Name
1982
1983
1984
03-437172
Theodoulous
0  0  0  03-438175
Eleada
$ 24,594 0  0  03-438176
Elenodoros
24,300
0  0  03-438351
[1] Evangelia 47,842
0  0  03-438417
Michael
109,073
0  0  03-439283
Eleada
0  $ 36,996 $ 10,000 03-439284
Elenodoros
0  $ 37,260
10,000
03-439458
Michael
60,000
93,870
0  03-439702
Evangelia
0  24,549
0  03-440526
Evangelia
0  25,025
0  03-441268
Evangelia
0  0  65,001
03-441391
Michael
0  0  102,048
03-441537
Michael
0  0  69,500
03-441693
Michael
0  0  110,558
03-442079
Michael
0  0  8,190
509765
Michael
0  0  1,125
509766
Evangelia
0  0  1,125
Total
$ 265,809
$ 217,700
$ 377,547
Total gross deposits were $ 861,056. Of that total, $ 251,240 represented transfers or redeposits (redeposits) as follows: Table 5 Redeposits
Year
Amount
1982
$ 172,849
1983
17,732
1984
60,659
$ 251,240
During the years in issue, the *546 Theodoulous earned, reported, and omitted interest on their NSB accounts as follows: Table 6
1982 1983 1984 Total NSB interest income
$ 4,703
$ 5,453
$ 3,025
NSB interest income per return
3,322
3,925
2,055
Omitted interest income
$ 1,381
$ 1,528
$ 970  Although four of the Theodoulous' accounts were in the names of their two minor children, they were in substance owned by Michael. Interest was earned by Michael on those four accounts as follows: Table 7
Acct. No.
[1] Name 1982
1983
1984
03-438175
Eleada
$ 654  0 0 03-438176
Elenodoros
649
0 0 03-439283
Eleada
0 $ 548  $ 575  03-439284
Elenodoros
0 531
468
Total  $ 1,303
$ 1,079
$ 1,043
Those totals are included in the sums set forth in table 6, supra. 14. Money Held by Michael for Others
Teddy Mijailidis (Mijailidis), Michael's nephew, gave Michael approximately $ 5,000 in 1982 and $ 25,000 in 1984 to hold on his behalf. Similarly, in 1983, Michael's brother Demetrios Theodoulou (Demetrios) gave Michael *547 $ 80,000 to hold on his behalf. The amounts held by Michael for Mijailidis and Demetrios were not owned by Michael. 15. Use of Cashier's Checks
During the years in issue, Michael or Evangelia purchased cashier's checks from NSB as follows: Cashier's Checks
Table 8 1982
Check
Date
Amount
Number Payee
1/7/82
$ 10,000.00 0306181  Michael Theodoulou
1/7/82
5,000.00
0306182  Michael Theodoulou
3/17/82
529.39
0311159  Brooklyn Union Gas
3/20/82
4,000.00
0311202  Michael Theodoulou
8/23/82
1,000.00
0327097  Alfonso Gonzales
8/31/82
565.00
0327221  City Collector
10/16/82
50,000.00
0332432  Michael Theodoulou
10/19/82
35,000.00
0332459  Michael Theodoulou
10/19/82
5,000.00
0332472  Michael Theodoulou
10/19/82
10,000.00
0332477  Michael Theodoulou
10/19/82
10,000.00
0332476  Michael Theodoulou
10/19/82
2,500.00
0332474  Michael Theodoulou
10/19/82
10,000.00
0332480  Michael Theodoulou
10/19/82
10,000.00
0332479  Michael Theodoulou
10/19/82
5,000.00
0332471  Michael Theodoulou
10/19/82
10,000.00
0332478  Michael Theodoulou
10/19/82
7,500.00
0332473  Michael Theodoulou
10/19/82
10,000.00
0332475  Michael Theodoulou
12/7/82
5,000.00
0327581  Michael Theodoulou
Total  $ 191,094.39
*548 Table 9 1983
Check Date
Amount
Number
Payee
3/25/83
$ 116.00    0339265  N.Y. State Income Tax
3/25/83
404.00
0339266  Internal Revenue Service
3/25/83
30,648.58
0339264  City Collector
8/1/83
666.00
0352704  The Home Indemnity Co.
8/9/83
1,000.00
0352835  Carl Erman
8/31/83
864.00
0353142  The Traveler
9/17/83
30,025.00
0353393  Evangelia Theodoulou
9/26/83
600.00
0354501  Michael Theodoulou
9/30/83
32,560.92
0354572  Evangelia Theodoulou
9/30/83
50,000.00
0354570  Michael Theodoulou
9/30/83
83,040.01
0354571  Michael Theodoulou
Total  $ 229,924.51
Table 10
1984
Check
Date
Amount
Number Payee
1/17/84
$ 14,100.00 0360753  Crest Cadillac
1/17/84
1,335.00
0360752  DMV New Jersey
3/20/84
47,862.13
0373179  Michael Theodoulou
3/20/84
36,869.52
0373181  Michael Theodoulou
4/7/84
3,776.00
0373460  Internal Revenue Service
7/21/84
6,932.77
0382756  Stevens Food, Inc.
7/31/84
51,264.61
0382909  Michael Theodoulou
7/31/84
51,264.62
0382910  Michael Theodoulou
7/31/84
62,617.23
0382911  Michael Theodoulou
12/31/84
75,000.00
0398652  Barclays Bank Cyprus for
credit to account of Michael
Theodoulou 12/31/84
75,000.00
0398653  Barclays Bank Cyprus
for credit to account of Michael Theodoulou Total  $ 426,021.88
*549 During the years in issue, the following cashier's checks were purchased with funds not from specifically identified, nontaxable sources. [2]
Table 11
1982
Date
Amount
Payee 3/17/82
$ 529.39  Brooklyn Union Gas  8/23/82
1,000.00
Alfonso Gonzales  8/31/82
565.00
City Collector  12/7/82
5,000.00
Michael Theodoulou  Total  $ 7,094.39
Table 12
1983
Date
Amount
Payee
8/1/83
$ 666   Home Indemnity Corp.  8/9/83
1,000
C. Erman, Attorney  8/31/83
864
Travelers  9/17/83
17,000
Evangelia Theodoulou*  9/26/83
600
Michael Theodoulou  9/30/83
7,500
Evangelia Theodoulou*  Total  $ 27,630
Table 13
1984
Date
Amount
Payee
1/17/84
$ 4,435 Crest Cadillac and DMV-New  Jersey*   4/07/84
3,776
Internal Revenue Service  12/31/84
44,000
Barclays Bank and Barclays  Bank*   Total  $ 52,211
*550 16. The Theodoulous' Foreign Accounts
In 1983 and 1984, Michael and Evangelia caused the following transfers of money to be made from the Atlantic Bank of New York to the National Bank of Greece, Athens, Greece, to open U.S. dollar accounts or purchase U.S. dollar certificates of deposit: Table 14
1983 Wire Transfers
Date
Amount Type of Account Holder 09/15/83
$ 10,000 Regular savings  Michael
09/19/83
30,025
Regular savings  Evangelia
10/03/83
165,601
Time certificate  Michael/Evangelia
Total  $ 205,626
Table 15
1984 Wire Transfers
Date
Amount Type of Account Holder 03/20/84
$ 96,700 Time certificate  Michael/Evangelia
07/31/84
165,146
Time certificate  Michael/Evangelia
Total  $ 261,846
By virtue of those accounts and certificates, the Theodoulous earned interest as follows: Table 16
Foreign Interest Earned 1983
$ 4,706 1984
36,130
Of the funds transferred by the Theodoulous to their foreign accounts, the following amounts did not come from specifically identified, nontaxable sources: Table 17
Year
Amount
1983
$ 10,000
1984
11,968
17. Purchase of Cars
In 1984, Michael *551 purchased five new cars for the following amounts: [3]
Table 18
Type of Car Date of Purchase Amount 1984 Cadillac Eldorado
01/16/84
$ 22,250
1984 Ford Thunderbird
01/28/84
10,228
1984 Mercedes Benz 300D-T
03/06/84
8,051
[1] 1984 Cadillac Coupe de Ville 04/04/84
7,500
1984 Mercedes Benz 300SD
10/31/84
[2] 10,750
Total  $ 58,779
Of the funds used by Michael to purchase automobiles in 1984, $ 44,679 did not come from specifically identified, nontaxable sources. 18. Deposit to Michael's Personal Account of Checks Received by CMEM
On April 29, 1982, Michael deposited into his NSB account *552 number 03-438417 a check in the amount of $ 5,291. That check represented a Federal corporate income tax refund owed to CMEM. On September 24, 1982, Michael deposited into his NSB account number 03-438417 a check in the amount of $ 14,649. That check was from the National Flood Insurance Program for a casualty loss at the Golden Dove. 19. IRS Audit
At the end of 1984, Revenue Agent Alex Malichiwski (Malichiwski), of respondent's Examination Division, was assigned to audit CMEM's return for its taxable year ended September 30, 1983, and the Theodoulous' return for their 1983 taxable year. In May 1985, Malichiwski was assigned to audit CMEM's taxable year 1982 tax return and the Theodoulous' 1982 tax return. Subsequently, he also audited CMEM's taxable years 1984 and 1985 tax returns and the Theodoulous' 1984 tax return. As a part of the audit, Malichiwski prepared an analysis of bank deposits and cash expenditures for the Theodoulous 1982, 1983, and 1984 taxable years, and CMEM's 1982, 1983, 1984, and 1985 taxable years. In preparing that analysis, Malichiwski relied upon bank deposit and withdrawal slips provided by NSB along with records prepared by the bank. At the *553 outset of Malichiwski's audit, petitioners were represented by their accountant, Bernard Reis (Reis), who had a power of attorney. In response to questioning by Malichiwski, Reis told the agent that the Golden Dove was Michael's sole source of income, that Michael had no cash on hand at the beginning of 1982, and that Michael had no interest or ownership in any other property, land, real estate, stocks, or bonds. ULTIMATE FINDINGS OF FACT The Theodoulous understated their taxable income on their returns for each of the years 1982 through 1984 in the amounts of $ 43,779, $62,364, and $ 370,701, respectively, and, as a result, underpaid their tax for each such year. [4]
*554 CMEM understated its taxable income on its returns for each of its taxable years 1982 through 1985 in the amounts of zero, $ 40,114, $243,140, and $ 78,145, respectively, and, as a result, underpaid its tax for its 1983 through 1985 taxable years. [5]
Underpayment of tax by the Theodoulous for 1982, 1983, and 1984 (on account of unreported rental income, unreported interest on foreign bank accounts, and unreported income from CMEM) was the result of fraudulent intent on the part of Michael Theodoulou. Underpayment of tax by CMEM for its taxable years 1983, 1984, and 1985, on account of unreported net sales and unreported vending machine receipts, was due to fraud on the part of CMEM. OPINION Respondent has determined deficiencies and additions to *555 tax against both CMEM and the Theodoulous. Michael is the sole owner of CMEM. CMEM operates the Golden Dove on Staten Island, in New York City. Respondent claims that Michael received substantial amounts of unreported income during the years in issue, much of it earned (and unreported) by CMEM. Petitioners contest the validity of respondent's notices of deficiency, deny respondent's claims, contest the additions to tax, claim protection under the statute of limitations, and demand innocent spouse relief for Evangelia. We shall begin by considering the validity of respondent's notices of deficiency. I. Arbitrariness
As a preliminary matter, we must answer petitioners' claims that the notices of deficiency against both CMEM and the Theodoulous lacked any rational foundation to the extent that they determined deficiencies resulting from unreported sales income for the Golden Dove for any of the years in issue. Under La Bow v. Commissioner, 763 F.2d 125, 132 (2d Cir. 1985), affg. in part and revg. in part T.C. Memo. 1983-417, to which we defer in accordance with the doctrine of Golsen v. Commissioner, 54 T.C. 742 (1970), *556 affd. 445 F.2d 985 (10th Cir. 1971), respondent must come forward with a minimal evidentiary foundation in support of her determination of unreported income. If she fails to do so, her determination will be deemed arbitrary and, consequently, she will lose her so-called presumption of correctness and will be forced to go forward with the evidence. See La Bow v. Commissioner, supra at 132. In the instant case, however, we believe that respondent possessed the minimal evidentiary foundation necessary to support her notices of deficiency at the time they were issued against both CMEM and the Theodoulous and that, therefore, the burden of going forward generally must remain with petitioners as in the usual case. See Rule 142(a). By the time the first deficiency notice herein was issued (December 14, 1987, to CMEM), respondent had been examining first CMEM and then both CMEM and the Theodoulous for almost 3 years. See CMEM, Inc. v. Commissioner, T.C. Memo. 1991-467. There can be no doubt that respondent knew that Michael owned all of CMEM's stock (CMEM's ownership is indicated on its returns). *557 Respondent also had found numerous bank accounts containing substantial, unexplained deposits in the names of members of the Theodoulou family. Using the bank deposits and cash expenditures method for reconstructing income, respondent determined approximately $ 890,000 of unsatisfactorily explained income of the Theodoulous for their 1982 through 1984 taxable years. Finding no other source to account for a substantial portion of that income, save the Golden Dove, respondent presumed that such income emanated from CMEM. Petitioners argue that respondent ignored substantial background information regarding sources of income that could have accounted for the unexplained bank deposits. Even so, Bernard Reis, petitioners' representative in the early stages of the audit, told respondent that the Golden Dove was the Theodoulous' sole source of income, that the Theodoulous had no cash on hand at the beginning of 1982, and that Michael had no interest or ownership in any other property, land, real estate, stocks, or bonds. We do not believe respondent remiss in accepting Reis' statements on that score. We shall not allow petitioners successfully to argue that respondent should have *558 ignored the statements made by petitioners' own agent. Moreover, it is well established that bank deposits constitute prima facie evidence of the receipt of income. Parks v. Commissioner, 94 T.C. 654, 658 (1990); Tokarski v. Commissioner, 87 T.C. 74, 77 (1986). Thus, respondent applied an accepted method for the reconstruction of unreported income. Parks v. Commissioner, supra at 658; Harper v. Commissioner, 54 T.C. 1121, 1129 (1970) ("Where a taxpayer has made numerous deposits in bank accounts, the sources or nature of which are not accounted for or recorded in books and records maintained by him, determinations made by the Commissioner of income subject to tax on the basis of such deposits have been approved in many instances"). Respondent then determined deficiencies based on that unreported income and, thereafter, proceeded logically in determining similar deficiencies against CMEM. Respondent may or may not be able to defend the correctness of her income reconstruction against petitioners' substantive challenges. On the record before us, however, *559 we are not persuaded that respondent's deficiency determinations lacked any rational foundation. Thus, having determined that respondent's deficiency notices were not arbitrary, we now turn our attention to petitioners' argument that such determinations were erroneous. II. The Theodoulous
A. Rental Income
We have found that the Theodoulous received unreported gross rental income from the hotel property (see table 2) and from the rental of a room in their home (see table 3) as follows: Table 19
Unreported Gross Rental Income
Item
1982
1983
1984
Hotel
$ 16,458
$ 14,820
$ 13,240
Room in
home 6,000
6,000
6,000
Total  $ 22,458
$ 20,820
$ 19,240
Petitioners do not dispute that the Theodoulous received gross rental payments with respect to the hotel property as well as with respect to a portion of their home. Nevertheless, petitioners claim that respondent's determinations of increased deficiencies on account of such receipts are erroneous since she does not account for potential deductions that might have reduced the "taxable" income reportable by the Theodoulous on account of such payments. Respondent bears the burden of proof *560 with regard to the rental income in question because a deficiency with regard to those items was first determined by respondent in her answer. Rule 142(a). With that in mind, petitioners cite Perez v. Commissioner, T.C. Memo. 1974-211, and contend that it is incumbent upon respondent to establish and eliminate all potential deductions, such as property taxes on the hotel property and depreciation allowances on both properties, in order to demonstrate that the Theodoulous received net rental income. Petitioners then reason that, since respondent has failed to eliminate potential deductions, she has not carried her burden of demonstrating that the Theodoulous received taxable income with respect to their rental activities. Petitioners, however, are mistaken in their reading of the law on the subject. In Perez v. Commissioner, supra, we stated that the general rule was well settled that, "once the Government establishes the existence of unreported income and allows the deductions claimed on the return, it does not have the further burden of proving the negative that the taxpayer did not have any additional deductions." *561 In Perez, we accepted the general rule, but declined to apply it because, on the record, there appeared a genuine basis for the taxpayer's claim that he made cash payments that would reduce the amount of unreported income shown by respondent. The record here does not provide a similar basis. On brief, petitioners argue that leases with regard to the hotel property are in evidence and establish Michael's obligation to pay land taxes. Be that as it may, petitioners have not directed us to any evidence that shows that Michael did pay such land taxes or, even if he did, when he paid them (i.e., during the years in issue). Thus, there is an insufficient basis in the record for us to do other than apply the well-settled general rule that relieves the Government of any further burden. See Perez v. Commissioner, supra; cf. Franklin v. Commissioner, T.C. Memo. 1993-184. Likewise, petitioners claim that there must have been deductible depreciation for both the hotel property and the portion of the residence rented out. Petitioners, however, have failed in both cases (1) to show any allocation between land (which *562 is not depreciable) and the building, (2) to show what method of depreciation is claimed, or (3) even to show that any depreciable basis remained during the years in issue. All of that information should be within the possession of petitioners. We shall not require respondent to show any more than she has. See Perez v. Commissioner, supra; cf. Franklin v. Commissioner, supra.We thus sustain in full respondent's determination of deficiencies as they relate to the hotel property and rental of the residence. B. Interest on Foreign Accounts
We have found that, in 1983 and 1984, the Theodoulous transferred $ 205,626 and $ 261,846, respectively, to Greece in order to purchase CD's or open savings accounts (see tables 14 and 15, supra). The Theodoulous concede that those funds remained on deposit in foreign banks in 1983 and 1984, although they do not specify the location of those accounts. Since the Theodoulous maintained no books and records with respect to those deposits, respondent imputed interest income to the Theodoulous equal to the sum that likely would have been earned had the funds been deposited *563 at interest in the U.S. Petitioners argue that respondent has introduced no evidence as to what the rates and terms of deposit on the Theodoulous' funds were or even where the money was kept (Cyprus or Greece). They claim that this deficiency of evidence represents a failure by respondent to carry her burden of proof. Respondent bears the burden of proof with regard to the interest in question because a deficiency with regard to those items was first determined by respondent in her answer. Rule 142(a). For the reasons that follow, we conclude that respondent has carried her burden of proof. Here, respondent has established that definite sums were kept on deposit in U.S. dollar accounts in foreign banks for specific periods of time. Petitioners have not challenged respondent's assumption that those deposits earned interest, which either was paid to petitioners or credited to their accounts. Apparently, petitioners simply contend that respondent has not shown the amount of such interest. Without recourse to the books and records of the Theodoulous, which section 6001 requires them to maintain, but, apparently, they did not, respondent has imputed an interest rate on those *564 deposits within the range of rates paid on U.S. accounts, as shown in data published by the International Monetary Fund. Such data shows that U.S. interest rates are higher than those paid in Cyprus but lower than those paid in Greece. [6]
*565 Although respondent has the burden of proof as to the amounts of interest earned on the accounts in question, respondent need only carry that burden by a preponderance of the evidence. Rule 142(a). We know the amounts on deposit and the terms (periods) of those deposits. We have no doubt that some interest was earned. We lack only an interest rate (or rates) to make simple mathematical computations. We accept the average interest rates put forward by respondent as some evidence of the interest rates actually earned by petitioners. Despite being in a significantly better position to furnish information regarding the actual interest rates received, petitioners have declined to come forward with any evidence, choosing instead to rely upon the possibility that respondent would not be able to carry her burden of proof. Thus, having put no contrary evidence on the table, and respondent having put on some credible evidence of interest rates, we are justified in having found that respondent has, by a preponderance of the evidence, shown additional interest earned of $ 4,706 and $ 36,130 for 1983 and 1984, respectively, from foreign bank accounts. (see table 16, supra.) *566 Cf. Cohan v. Commissioner, 39 F.2d 540, 544 (2d Cir. 1930). Accordingly, we hold that gross income was realized to petitioners in those amounts and sustain respondent's determinations of deficiencies to the extent attributable to such amounts of interest. C. Unreported Interest Income Earned on Domestic Accounts
In her notice of deficiency, respondent determined that the Theodoulous omitted interest income in the following amounts: $ 1,565, $ 1,528, and $ 970 for 1982, 1983, and 1984, respectively. [7] As we have found (see table 6), petitioners omitted interest income as follows: Table 20
1982
1983
1984
Total NSB interest income
$ 4,703
$ 5,453
$ 3,025
NSB interest income per return
3,322
3,925
2,055
Omitted interest income
$ 1,381
$ 1,528
$ 970  Respondent calculates the omitted interest income by subtracting from the interest earned on those accounts the interest reported by the Theodoulous. We agree with respondent's calculations and have so found. Although the Theodoulous take issue with that calculation, their primary argument is that respondent has included as interest income interest earned and reportable *567 for tax purposes by the Theodoulous' children. [8]
Respondent, however, argues that Michael was the sole source of all funds deposited into his children's accounts. Moreover, she argues that Michael made withdrawals from those accounts in order to help fund the purchase of the property on which the Golden Dove was located, as well as for other uses. Accordingly, respondent argues that Michael never *568 relinquished dominion and control over the funds and, as a beneficial owner, is taxable on any interest earned therefrom. Petitioners do not contest respondent's characterization of the uses to which Michael put the money in the children's accounts. Petitioners instead explain that Michael was acting pursuant to a Cypriot tradition whereby the head of a household is expected to put money aside for family members. At trial, Michael testified that, whenever he borrowed money from the children's accounts, he felt obliged to return it at a later date. Thus, petitioners argue that, since Michael viewed the funds as the children's ultimate property, and since any use of those funds was meant to accrue to the children's long-term benefit, any interest earned on the children's accounts should not be taxable to Michael and Evangelia. Our finding here is based on the identity of the true owner of the income-producing property. Doxey v. Commissioner, T.C. Memo. 1991-150, affd. without published opinion 979 F.2d 1534 (5th Cir. 1992). In such an inquiry, we look not to mere legal title, but to beneficial ownership. Serianni v. Commissioner, 80 T.C. 1090, 1104 (1983), *569 affd. 765 F.2d 1051 (11th Cir. 1985); Hook v. Commissioner, 58 T.C. 267, 273, 276 (1972); Doxey v. Commissioner, supra.It is command over the property or the enjoyment of its economic benefits that marks the real owner. Hang v. Commissioner, 95 T.C. 74, 80 (1990). When transactions are between family members, special scrutiny of the arrangement is necessary, lest what is in reality but one economic unit be multiplied into two or more. Helvering v. Clifford, 309 U.S. 331, 335 (1940). While we do not doubt the sincerity of Michael's long-term intentions, we nevertheless have found that Michael owned the accounts in question during the years in issue. The circumstance that Michael may have viewed the funds as the eventual property of his children does not change the nature of the dominion and control he exercised over those funds during the years in issue. Michael's access to, and use of, the money in the children's bank accounts to facilitate his own business ventures establish him as the constructive owner of those funds. *570 As such, we hold that he is subject to tax on any income earned on the children's accounts. Accordingly, we sustain respondent's determination with respect to the totality of the unreported interest income earned on the Theodoulous' bank accounts during the years in issue. D. Unreported Income From Tax Refunds and Insurance Proceeds Due CMEM
The parties stipulate that, on April 29, 1982, Michael deposited into his NSB account number 03-438417 a check in the amount of $ 5,291. That check represented a Federal corporate income tax refund owed to CMEM. Michael's assertion of dominion and control over those funds results in a constructive dividend [9] to Michael in the amount of the income tax refund. Respondent contends that Michael similarly should be deemed to have received a constructive dividend from CMEM in the amount of $ 14,649 on account of a check that he deposited into that same account on September 24, 1982. That check was from the National Flood Insurance Program *571 for a casualty loss suffered at the Golden Dove. Petitioners argue that there was no evidence offered as to the identity of the rightful payee: CMEM or Michael. We disagree. Since CMEM was the owner of the Golden Dove, and Michael had not yet acquired ownership of the underlying land, it is reasonable to infer that CMEM was the proper recipient of any insurance proceeds resulting from damage to the diner. Being presented with no proof to the contrary by petitioner, we hold for respondent on the issue. E. Other Unreported Income
Respondent has determined that the Theodoulous received additional unreported income of $ 219,918 in 1982, $ 245,981 in 1983, and $ 426,346 in 1984 (approximately $ 890,000 for all years in question).[10] Respondent's determinations are based on her application of the bank deposits and cash expenditures method of reconstructing income, the accurate use of which petitioners challenge. Petitioners bear the burden of proving that respondent's determination of unreported income, computed through the use of that method, is incorrect. Rule 142(a); DiLeo v. Commissioner, 96 T.C. 858, 871 (1991), affd. 959 F.2d 16 (2d Cir. 1992); *572 Parks v. Commissioner, 94 T.C. 654, 658 (1990). A bank deposits and cash expenditures analysis is often used to reconstruct gross income when a taxpayer's records are inadequate or nonexistent. Bank deposits are prima facie evidence of income. Tokarski v. Commissioner, 87 T.C. 74, 77 (1986). The method hypothecates gross income by, first, adding together all bank deposits made during a year plus all expenditures made with cash not deposited in a bank. Hays v. Commissioner, T.C. Memo. 1971-300. The *573 amount thus computed is then reduced to reflect nontaxable receipts, interbank transfers, and other duplications of items. Id. The reduced amount represents unreported income. When the bank deposits method is employed, respondent must take into account any nontaxable source or deductible expense of which she has knowledge. DiLeo v. Commissioner, supra at 868. If the taxpayer feels that the Government's method of computation is unfair or inaccurate, the burden is on him to show such unfairness or inaccuracy. Id.
The following table 21 summarizes our findings with regard to the Theodoulous' bank deposits, purchases of cashier's checks, overseas wire transfers, and expenditures for automobiles, all during the years at issue. [11] (See tables 4, 8-10, 14, 15 and 18 supra.): Table 21
Items
1982
1983
1984
Total
Total deposits
$ 265,809
$ 217,700
$ 377,547  $ 861,056  Cashier's checks
191,094
229,925
426,022
847,041
Wire transfers
0  205,626
261,846
467,472
Automobiles
0  0  58,779
58,779
Total  $ 456,903
$ 653,251
$ 1,124,194
$ 2,234,348
*574 Respondent begins her analysis of bank deposits and cash expenditures with the same figures. She then subtracts from those figures certain amounts that specifically were accounted for to her satisfaction. Accordingly, respondent determined unexplained deposits and cash expenditures against the Theodoulous in the following amounts: Table 22
Item 1982 1983 1984 Deposits
$ 265,809 $ 217,700 $ 377,547 less amount  accounted  (52,985)
(9,349)
(60,059)
for  unexplained  $ 212,824
$ 208,351
$ 317,488
Cashier's
191,094 229,925 426,022 checks
less amount  accounted  (184,000)
(202,295)
(373,811)
for  unexplained  $ 7,094  27,630
52,211
Wire
-0-  205,626 261,846 transfers  less amount  accounted  -0-  (195,626)
(249,878)
for  unexplained  -0-
10,000
11,968
Automobiles
-0-  -0-  58,779 less amount  accounted  -0-  -0-  (14,100)
for  unexplained  -0-
-0-
44,679
Total
unexplained $ 219,918
$ 245,981
$ 426,346
We accept respondent's subtractions and, in so far as they go, adopt them as our own. In addition to the expenditures *575 that, pursuant to respondent's concessions, can be traced directly to specific nontaxable sources, petitioners also contend that the funds legitimately available to the Theodoulous' during each of the years in issue exceed the amount of bank deposits and cash expenditures determined by respondent by way of her income reconstruction. In her application of the bank deposits and cash expenditures method of analysis, however, respondent made no additional downward adjustments for nontaxable sources, already taxed sources, and redeposits. Moreover, she refused to consider the Theodoulous' cash on hand at the beginning of each of the years in issue. According to petitioners, those failures represent a fatal flaw in respondent's income reconstruction. They contend that if we properly adjust for: (1) Cash on hand, (2) loans, (3) wages and rents, and (4) transfers/redeposits, then virtually all of the approximately $ 890,000 of unreported income determined under the income reconstruction disappears. In principle, we agree that, based on petitioners' evidence, we must make significant adjustments on petitioners' behalf with respect to the bank deposits and cash expenditures method employed *576 by respondent. As explained, infra, however, we differ with petitioners regarding the extent of those necessary adjustments. 1. Items Improperly Excluded from Respondent's Income Reconstruction
First, we shall examine the additional items that should have been taken into account by respondent and consider the manner in which those items should have been weighed under a proper application of the bank deposits and cash expenditures method. Then, using the deposit and expenditure items that we have found to be properly includable, we shall make our own reconstruction to determine the Theodoulous' unreported income for the years in issue. a. Cash on Hand at the End of 1981
On brief, petitioners argue that Michael had a cash hoard of approximately $ 230,000 at the beginning of the years in issue. That hoard allegedly was composed of funds from the sale of previous diners, receipts from the rental of the hotel in Cyprus, and cash obtained from third party loans. Petitioners make broad pronouncements in support of their cash-hoard theory but adduce very little evidence in support thereof. For instance, it is alleged that approximately $ 160,000 of the cash hoard came *577 from funds previously invested in a Greek certificate of deposit. While petitioners do establish that such a certificate did exist and that it came due for payment in 1977, they do not demonstrate what became of its proceeds after that point, and offer no evidence whatsoever to show that the funds ever found their way into the U.S.
Similar proofs are lacking with respect to the rental income from the hotel in Cyprus. Moreover, petitioners do not document that funds derived from financial events, such as the sale of a previously owned diner, were on hand at the end of 1981. The circumstances of the Theodoulous at the end of 1981 do not paint a picture consistent with the possession of a large cash hoard. Michael testified that, after suffering a heart attack in 1981 he asked his 19-20 year old nephews, Petros Petrou and Antonios Nicola, to "give me some money, and * * * become partners." In December 1981, Michael received $ 10,000 from Petros Petrou. Michael stated that, at the time, he was afraid that he was "going to lose everything". According to a financial statement filed by Michael with the New York State Liquor Authority on December 24, 1980, the Theodoulous' only liquid *578 asset was $ 22,204 deposited in a local bank. That financial statement, filed only a year prior to the first year in issue, is consistent with the apparently difficult financial times experienced by the Theodoulous in the early stages of the Golden Dove's development. Finally, when pressed at trial regarding the location of the alleged cash hoard at the end of 1981, Michael testified that the bulk of the funds were kept in bank accounts. Petitioners have come forward with no bank records to verify that claim. We find petitioners' arguments regarding the existence of a large cash hoard to be unpersuasive. Nevertheless, it is equally implausible that the Theodoulous had not a cent to their name at the end of 1981, as respondent's income reconstruction would have us believe. On brief, respondent herself agrees that the financial filing with the New York State Liquor Authority represents a "much truer reflection of Michael's cash position" at the end of 1981. Being convinced that the Theodoulous had at least that much on hand, we shall credit the Theodoulous with having liquid assets of $ 22,204 at the end of both 1980 and 1981. We have found accordingly. b. Cash on Hand at *579 the End of 1982
Just as respondent should have taken into account the Theodoulous' cash on hand at the end of 1981 when considering their allegedly unreported income for 1982, so we must also take into account cash on hand at the end of 1982 as part of our inquiry regarding the Theodoulous' 1983 taxable year. As enumerated in section II.E.2.b., infra, the Theodoulous had cash on hand of $ 40,022 at the end of 1982. We believe it essential to an accurate application of the bank deposits and cash expenditures method to give the Theodoulous credit for that cash on hand. Respondent objects to the inclusion of such amount on the ground that petitioners do not directly prove that those funds were ever expended or deposited in 1983. See Stoller v. Commissioner, T.C. Memo. 1983-319 (automatic adjustment to take account of amounts reported on return not required where no evidence that such amounts were used to make deposits), and Marcello v. Commissioner, T.C. Memo. 1964-304 (record did not support that gambling winnings declared on return were used to make deposits or pay cash for assets), affd. 380 F.2d 509 (5th Cir. 1967). *580 In the instant case, we believe that the application of preexisting funds to account for otherwise unexplained expenditures can be inferred and we have so found. The Theodoulous possessed $ 40,022 of cash at the end of 1982. They expended funds in 1983 substantially in excess of their reported income sources. We think it a fair inference (in this case unrebutted by any evidence from respondent), that those excess funds from 1982 were used, until exhausted, to support the Theodoulous' expenditures in 1983 not funded from otherwise elucidated sources. Moni v. Commissioner, T.C. Memo. 1981-110; Hyams v. Commissioner, T.C. Memo. 1958-58. Accordingly, we have found that the Theodoulous had cash on hand of $ 40,022 at the end of 1982, which must be considered in determining the extent of their unreported income in 1983. c. Loans
Petitioners also argue that, during the years in issue, Michael held approximately $ 30,000 for his nephew Teddy Mijailidis (Mijailidis) and approximately $ 80,000 for his brother Demetrios Theodoulou (Demetrios). Petitioners further claim that the Theodoulous also received $ 15,000 as a *581 loan from La Morte's Cigarette and Music Services, Inc. (La Morte), in 1982. Respondent refused to credit any of those amounts in developing her income reconstruction. At trial, Mijailidis testified that he gave Michael approximately $ 5,000 in 1982 and $ 25,000 in 1984 to hold on his behalf. Such an arrangement was necessary since Mijailidis, as both a compulsive and unsuccessful gambler, was unwilling to deposit any winnings in his own account for fear that the money would be seized by creditors. Michael confirmed that story in his own testimony. Although we find such an account to be unusual, we are nevertheless satisfied of the witness' credibility in this instance. Accordingly, we have found that the $ 30,000 in question belonged to Mijailidis and not to Michael. Similarly, we have found that the $ 80,000 held for Demetrios should also be credited in petitioners' favor. Demetrios himself had died sometime prior to trial and thus was unavailable for examination. We found Michael's testimony on the issue, however, to be persuasive. In addition, although the bulk of the testimony provided by Andreos Koukounis (Michael's lawyer in Cyprus) on that issue was inadmissable *582 on hearsay grounds, his more generalized comments supplied some corroboration of Michael's testimony. Thus, finding nothing in the record to indicate that Michael's statements regarding the $ 80,000 held for Demetrios were inaccurate, we find for petitioners on that issue. Where the alleged $ 15,000 loan from La Morte in 1982 is concerned, the record displays ample evidence verifying its existence and we have found accordingly. We shall therefore adjust our bank deposits and cash expenditures analysis downward to take account of the $ 30,000 held by Michael for his nephew Mijailidis ($ 5,000 in 1982 and $ 25,000 in 1984), the $ 80,000 held by Michael for his brother Demetrios in 1983, and the $ 15,000 received by Michael as a loan from La Morte in 1982. d. Wages and Rents
Similar adjustments are required for income on which the Theodoulous have already been taxed. On their tax returns for the years in issue (1982 through 1984), the Theodoulous reported income from wages and rents as follows: Table 23 Year
Wages
Rents
Total
1982
$ 15,600
0
$ 15,600
1983
13,360
$ 36,000
49,360
1984
20,800
51,000
71,800
Respondent, however, did not credit those *583 amounts in her income reconstruction. Given the facts and circumstances of the instant case, and the analysis articulated in section II.E.1.b., supra, which is equally applicable here, we are persuaded that the Theodoulous' wage and rental income did indeed constitute a source of the unexplained expenditures alleged by respondent. Accordingly, respondent was erroneous in failing to credit the Theodoulous' wage and rental income in her bank deposits and cash expenditures analysis. Likewise, we shall make a downward adjustment for the Theodoulous' previously unreported rental income in the amounts of $ 22,458 for 1982, $ 20,820 for 1983, and $ 19,240 for 1984, regarding which we have sustained respondent's determinations as discussed in section II.A. of this opinion. Having held that those amounts are independently taxable, it would be inequitable to tax them twice through failing to make appropriate adjustments in respondent's income reconstruction. e. Transfers and Redeposits
The next item that must be considered in our bank deposits and cash expenditures analysis is transfers and redeposits. In a properly applied income reconstruction, analysis is undertaken only with *584 reference to net deposits. Such a figure is derived by subtracting from the gross deposits those deposits that are attributable to transfers (funds withdrawn from one account and then deposited into another) [12] and redeposits (funds withdrawn from one account and later deposited back into the same account). To do otherwise would be to inflate artificially and erroneously the amount of "bank deposits and cash expenditures" for which petitioners must satisfactorily account. As we have found, the Theodoulous had gross deposits as follows: Table 24
Year
Gross Deposits
1982
$ 265,809
1983
217,700
1984
377,547
See table 4, supra. Respondent concedes, and petitioners claim, offsetting redeposits and transfers as follows: Table 25
Year
Respondent's Concessions
Petitioners' Claim
1982
$ 52,985
$ 167,693
1983
9,349
46,732
1984
60,059
78,592
*585 After a careful transaction-by-transaction analysis (see appendix) we have found (see table 5) that the appropriate figures for transfers and redeposits are $ 172,849, $ 17,732, and $ 60,659, for 1982, 1983, and 1984, respectively. Net deposits are thus as follows: Table 26
Year
Gross Deposits
Transfers and Deposits
Net Deposits
1982
$ 265,809
($ 172,849)
$ 92,960
1983
217,700
(17,732)
199,968
1984
377,547
(60,659)
316,888
The amounts set forth in table 26 as transfers and redeposits represent increases over amounts conceded by respondent for 1982, 1983, and 1984, as follows: Table 27
Year
Respondent's Concessions
We Find
Increase 1982
$ 52,985 $ 172,849
$ 119,864
1983
9,349
17,732
8,383
1984
60,059
60,659
600
Total  $ 122,393
$ 251,240
$ 128,847
The bulk of our increase is attributable to deposits that petitioners have identified, and we accept, as having their source in previous withdrawals (see appendix). The total of such increases attributable to those deposits (for the 3 years in question) is $ 93,907. As we noted in our treatment of the cash-on-hand issue (section II.E.1.b., supra), we believe it proper on *586 the facts at hand to infer, given a lack of any evidence to the contrary, that previous withdrawals constitute the source of subsequently made deposits or expenditures. Moni v. Commissioner, T.C. Memo. 1981-110; Hyams v. Commissioner, T.C. Memo. 1958-58. Similarly, where petitioners can point to specific withdrawals in excess of subsequent deposits, we believe that such withdrawals (up to the extent of the claimed redeposits) represent some evidence of transfers and redeposits. We recognize that, to a great extent, we rely on inferences to be drawn from deposit slips and the matching of similar amounts and dates and that we have assumed that "old" money was not withdrawn and hidden and "new" money substituted. Considering the record as a whole, however, we are comfortable in so doing. Finding no evidence, such as an irreconcilable amount of consumption or an unduly long lapse of time, to indicate otherwise, we are persuaded that petitioners' statements, and the evidence we have, linking demonstrated withdrawals to specific transfers and redeposits are sufficient to legitimize such claims. We have also given petitioners *587 credit for a $ 15,000 deposit made on July 28, 1982, to account number 03-438417, which they identify as the transfer of loan proceeds from a coffee supplier. At trial, Michael testified to having received the loan, which he subsequently repaid, from Coffee Associates. In support of Michael's testimony, petitioners also put into evidence a bank check in the amount of $ 15,000 from Fidelity Union Bank, dated July 26, 1982. Fidelity Union Bank was the bank then used by Coffee Associates. Peter and Constantine Callas, the former owners of Coffee Associates, testified that they did not remember conducting business with the Golden Dove or making the loan to Michael. Nevertheless, they also admitted that reliable company records did not extend back to 1982. Given Michael's credible testimony on the issue, as well as the production of a check from Coffee Associates' bank in the amount of the claimed loan, dated 2 days prior to the claimed deposit, we are convinced that the evidence supports petitioners on that issue. Finally, we have allowed petitioners credit for a deposit of $ 5,291 to account 03-438417 on April 30, 1982, and a deposit of $ 14,649 to account 03-438417 on September *588 24, 1982. Those respective deposits represent a tax refund and an insurance payment to CMEM regarding the receipt of which we have already determined Michael to be independently taxable. See sec. II.D., supra. Accordingly, we have found that the transfers and redeposits allowed by respondent ($ 122,393) should be increased by (1) $ 93,907 of additional transfers and redeposits which have been linked to prior withdrawals, (2) $ 15,000 representing the deposit of the loan from Coffee Associates, and (3) $ 19,940 representing the deposit of a tax refund and insurance proceeds due CMEM. We have not, however, accepted petitioners' argument that transfers and redeposits should also be increased by $ 46,933 attributable to the sale of a previously owned diner. Petitioners list 14 separate deposits between March 25, 1983, and July 14, 1984, that they explain only as being derived from "exchange (Diner)" (see appendix). If, by that cryptic notation, petitioners mean to imply that the source of those deposits was income earned from the final sale of the Derby Diner in January 1979, we are not convinced. There is no evidence in the record to corroborate Michael's testimony that he *589 realized a $ 75,000 profit on the sale of the Derby Diner, or to indicate the point at which the alleged profit was actually received. Moreover, a span of more than 3 years between the acquisition of funds and later expenditures or deposits, given the facts of the instant case, is sufficiently long so as to nullify any inference that the former was the source of the latter. Accordingly, petitioners have not adduced proofs sufficient to establish the $ 46,933 of deposits noted as "exchange (Diner)" as amounts which should be included in transfers and redeposits for which petitioners will be given credit in our income reconstruction. f. Cash Withdrawals -- Application of Proceeds
During 1982 and 1983 the Theodoulous made cash withdrawals from their NSB accounts of $ 61,011 and $ 13,025, the ultimate disposition of which is uncertain. [13] Based on our analysis articulated in section II.E.1.b., supra, we believe it appropriate to find (and have found) that those cash withdrawals were used to satisfy otherwise unexplained deposits or expenditures determined by respondent against the Theodoulous. Accordingly, we give petitioners credit for those amounts in our reapplication *590 of the bank deposits and cash expenditures analysis. See section II.E.2.a., infra. g. Interest Earned on Domestic Accounts
As we have found (table 6), the Theodoulous earned interest on their NSB accounts in the amounts of $ 4,703 in 1982, $ 5,453 in 1983, and $ 3,025 in 1984. The bulk of those amounts was reported by the Theodoulous as income in the year earned. The remainder was determined by respondent as unreported income, see section II.C., supra, where we sustain respondent's determination. Since the interest earned on the Theodoulous' NSB accounts either was taxed previously or forms part of respondent's deficiencies, the Theodoulous are entitled to credit for such amounts in our income reconstruction. The amounts of interest earned during the years in issue constitute available funds that, for the reasons previously elaborated, we shall infer were used to satisfy otherwise unexplained bank *591 deposits and cash expenditures during the years in issue. [14]
2. Revised Income Reconstruction
Taking into account the items we have found to be properly includable, we shall apply a bank deposits and cash expenditures analysis to reconstruct the Theodoulous' unreported income for the years in issue. The method we shall apply involves first a determination of the Theodoulous' available funds for each year, arrived at by aggregating cash on hand and nontaxable sources, as well as previously taxed and currently taxable sources. Next, we ascertain the Theodoulous' cash expenditures and bank deposits for each of the years in issue. We then compare the Theodoulous' available funds for each year to the bank deposits and cash expenditures made in those years. Insofar as the available funds are sufficient *592 to account for the deposits and expenditures made in each year, there will be no increase in the amounts by which the Theodoulous have otherwise underreported their income for the year in question. However, to the extent that the deposits and expenditures exceed the available funds from which they should have been derived, the amounts by which the Theodoulous have underreported their income for such year will be correspondingly increased. Our computations are summarized in table 28 at section II.E.3., infra. a. 1982
We have found that the Theodoulous had cash on hand at the beginning of 1982 of $ 22,204. During that year they also earned $ 15,600 in wages and $ 4,703 in domestic interest. In addition, the Theodoulous obtained $ 22,458 in rental payments: $ 16,458 from the hotel in Cyprus, and $ 6,000 from the rental of a room in their home. They also received loans of $ 20,000: $ 5,000 from Michael's nephew Teddy Mijailidis, and $ 15,000 from La Morte. [15] Finally, the Theodoulous had excess cash withdrawals of $ 61,011 from their NSB accounts that we have found were used to make various cash expenditures such as unexplained bank deposits, living expenses, cashier's *593 checks, etc. See sec. II.E.1.f., supra. Thus, the Theodoulous had available funds [16] of $ 145,976 from which to make cash expenditures and net bank deposits during the year. The Theodoulous made bank deposits and cash expenditures for 1982 in the amount of $ 105,954. In arriving at that figure, we first allocate $ 5,900 for living expenses. Although such amount may seem small, it is the amount utilized by respondent in her calculations and petitioners have not objected thereto. [17] Next, the Theodoulous spent $ 7,094 on cashier's checks for which petitioners have not adequately accounted. In addition, the Theodoulous made *594 $ 92,960 of net deposits ($ 265,809 of total deposits minus $ 172,849 of transfers and redeposits). The Theodoulous' available funds for 1982 ($ 145,976) exceed their bank deposits and cash expenditures for that year ($ 105,954) by $ 40,022. Given that positive available funds balance, yielded by the reapplication of an accurate income reconstruction, we find that the Theodoulous, in the aggregate, had no unexplained bank deposits or cash expenditures and therefore had no additional unreported income for their 1982 taxable year. b. 1983
At the end of 1982 there remained $ 40,022 of available funds in excess of the Theodoulous' total expenditures for the year. Given the lack of evidence that those additional funds were consumed or disposed of in some other fashion, we deem it proper to find (and have found) that the Theodoulous began their 1983 taxable year with cash on hand in the amount of $ 40,022. *595 In order to determine the Theodoulous' available funds for 1983, we first add to that amount wages of $ 13,360 and domestic interest of $ 5,453. We then add $ 56,820 of rental payments received during the year: $ 14,820 from the hotel in Cyprus, $ 6,000 from the rental of a room in their home, and $ 36,000 from CMEM as rent for the property underlying the diner. In addition, the $ 80,000 held by Michael on behalf of his brother Demetrios must be factored in as well. Finally, we include the $ 13,025 of excess cash withdrawals. See sec. II.E.1.f., supra. An aggregation of those amounts indicates that the Theodoulous had available funds in 1983 of $ 208,680. Where bank deposits and cash expenditures are concerned, we again allocate $ 5,900 for living expenses. In addition, the Theodoulous spent $ 27,630 on cashier's checks and $ 10,000 on wire transfers, for which petitioners have not adequately accounted. (see table 22). They also made net deposits of $ 199,968 ($ 217,700 of gross deposits minus $ 17,732 of transfers and redeposits). Thus, the Theodoulous made net deposits and cash expenditures of $ 243,498 during their 1983 taxable year. When comparing the $ 243,498 *596 of deposits and expenditures against the Theodoulous' available funds of $ 208,860 there emerges a discrepancy of $ 34,818. Accordingly, we find that the Theodoulous had additional unreported income of $ 34,818 for their 1983 taxable year. c. 1984
Our analysis for the Theodoulous' 1984 taxable year proceeds in the same fashion as it did for the previous 2 years. The Theodoulous, however, are deemed to have had no cash on hand at the beginning of 1984. Such is the case because the Theodoulous' expenditures for 1983 exceeded their available funds. Thus, the Theodoulous' available funds for 1984 comprised $ 20,800 of wages and $ 3,025 of domestic interest. In addition they obtained rental payments of $ 70,240: $ 13,240 from the hotel in Cyprus, $ 6,000 from the rental of a room in their home, and $ 51,000 from CMEM as rent for the land underlying the diner. Finally, they received another loan from Teddy Mijailidis, this time in the amount of $ 25,000. The Theodoulous therefore had available funds for 1984 of $ 119,065. Where bank deposits and cash expenditures are concerned, the Theodoulous had $ 5,900 of living expenses. They also expended $ 52,211 on unexplained cashier's *597 checks and $ 11,968 on unexplained wire transfers. In addition, the Theodoulous spent $ 44,679 during 1984 on the purchase of automobiles. Finally, they made $ 316,888 of net deposits ($ 377,547 of total deposits minus $ 60,659 of transfers and redeposits). When aggregated, those items yield deposits and cash expenditures of $ 431,646 for the 1984 year. In that year, the Theodoulous had available funds of $ 119,065 compared with the deposits and cash expenditures of $ 431,646. Accordingly, we find that the Theodoulous had an additional $ 312,581 of unreported income for their 1984 taxable year. 3. Summary of Income Reconstruction
For the reasons expounded in section II.E., we have determined, through the application of our own bank deposits and cash expenditures method of reconstructing income, that the Theodoulous had additional unreported income of $ 347,399: Zero in 1982, $ 34,818 in 1983, and $ 312,581 in 1984. Our calculations are summarized in the following table: Table 28
Income Reconstruction 1982
1983
1984
Available Funds:
Cash on hand
$ 22,204 [1] $ 40,022 0
Wages
15,600
13,360
$ 20,800 Rents
22,458
56,820
70,240
Interest
4,703
5,453
3,025
Loans
20,000
80,000
25,000
Cash withdrawals
61,011
13,025
0
Subtotal available funds  $ 145,976
$ 208,680
$ 119,065
*598 :Less Deposits and Expenditures
Living expenses
$ 5,900   $ 5,900  $ 5,900  Net deposits
92,960 199,968
316,888
Cashier's checks
7,094 27,630
52,211
Wire transfers
0 10,000
11,968
Automobiles
0 0
44,679
Subtotal deposits and  expenditures  $ 105,954 $ 243,498
$ 431,646
EQUALS TOTAL
ADDITIONAL
UNREPORTED
INCOME:
($ 40,022) $ 34,818 $ 312,581
4. Constructive Dividends
Respondent argues that the Theodoulous' unreported income attributable to CMEM constitutes constructive dividends. The extent to which such amounts represent constructive dividends, however, is dependent upon the earnings and profits of CMEM. Petitioners argue that CMEM was on the accrual method of accounting and, therefore, that the deficiencies we have sustained against CMEM should reduce its earnings and profits for its 1983 through 1985 taxable years. Respondent, on the other hand, contends that CMEM was a cash basis taxpayer and that, as a result, its earnings and profits should be unreduced by its tax deficiencies. The burden of proof on the issue rests with petitioners. Rule 142(a); Truesdell v. Commissioner, 89 T.C. 1280, 1295-1296 (1987). *599 Petitioners also point to Hadden v. Commissioner, 49 F.2d 709 (2d Cir. 1931), for the proposition that earnings and profits should reflect Federal income tax liabilities regardless of the corporation's accounting method, and regardless of whether proposed deficiencies are being contested. For the reasons stated in Webb v. Commissioner, 67 T.C. 1008 (1977), however, we decline to follow Hadden v. Commissioner, supra, and do not consider ourselves to be so bound under the Golsen Doctrine. Golsen v. Commissioner, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971). In our view, petitioners have not put forth evidence sufficient to carry their burden of proving that CMEM was on the accrual method of accounting during the years in issue. Nevertheless, at a pretrial conference it was agreed that a separate hearing would be held on issues relating to CMEM's earnings and profits. Accordingly, on appropriate motion from petitioners, a further hearing will be held on that issue. F. Disallowed Deductions for Charitable Contributions
*600 Citing a lack of required documentation, respondent also has disallowed claimed charitable contributions of $ 492 and $ 1,780 for the Theodoulous' 1983 and 1984 taxable years. Petitioners concede that issue. Accordingly, we sustain respondent's determination of deficiencies to the extent allocable to such disallowances. G. Reduction of Reported Rental Income
As enumerated in section III.B., infra, of this opinion, respondent disallowed all of CMEM's claimed rental deductions for its 1982 through 1985 taxable years. In accordance with that determination, respondent also reduced the amount of rental income reported by the Theodoulous, with respect to the alleged rental payments received from CMEM, in the amounts of $ 36,000 for 1983, and $ 51,000 for 1984. In their petition, the Theodoulous assigned error to that reduction. On brief, respondent argues that those adjustments should be reversed if corresponding rental deductions are allowed to CMEM. Since, for the reasons set forth in section III.B., infra, we find that CMEM was entitled to its claimed rental deductions for all of the years in issue, we must therefore also hold that respondent's reduction of the *601 rental income reported by the Theodoulous for their 1983 and 1984 taxable years was erroneous, and we so hold. H. Additions to Tax
1. Fraud
Respondent has determined additions to tax under section 6653(b)(1) and (2) against Michael for all of the years in issue. a. Section 6653(b)(1)
Section 6653(b)(1) imposes an addition to tax equal to 50 percent of any underpayment of tax if any part of such underpayment is due to fraud. Respondent has the burden of proving by clear and convincing evidence that some part of an underpayment for each year in issue is due to fraud. Sec. 7454(a); Rule 142(b). Consequently, respondent must establish both that (1) the taxpayer has underpaid his taxes for each year, and (2) some part of the underpayment is due to fraud. DiLeo v. Commissioner, 96 T.C. 858, 873 (1991), affd. 959 F.2d 16 (2d Cir. 1992). We believe that, to the extent that we have sustained respondent's determinations of deficiencies against the Theodoulous, we have done so on the basis of evidence that clearly and convincingly supports findings of underpayments in equal amounts. See sec. 6653(c)(1). Thus, *602 the sole issue remaining for consideration in determining the applicability of section 6653(b)(1) is whether Michael acted willfully to avoid taxes known to be owing. We have found that he did. On the strength of our income reconstruction, we believe that Michael's conduct evidenced a pattern of underreporting large amounts of income. Such a pattern will support an inference of willfulness. Holland v. United States, 348 U.S. 121, 139 (1954). As explained in more detail in section II.E., infra, we are convinced that Michael consistently and intentionally diverted net sales, in the amounts determined, from the Golden Dove to his own accounts without ever reporting such income at either the corporate or the individual level. His consistent use of cash, his unorthodox banking methods, and his failure to maintain adequate books and records also constitute badges of fraud. Williams v. Commissioner, 999 F.2d 760 (4th Cir. 1993), affg. T.C. Memo. 1992-153; Curry v. Commissioner, T.C. Memo. 1991-102. In addition, we find substantial indication of fraudulent intent *603 in Michael's failure to report interest income earned on foreign accounts, rental income from the hotel in Cyprus, and, in particular, income earned from renting out a room in his house. We give little credence to Michael's claims that he believed that income on his foreign endeavors was not taxable in the U.S. For instance, Michael asserts that his accountant was aware of the hotel in Cyprus but advised him that no tax was due. At trial, Michael's accountant testified to his belief that, during the years in issue, Michael was simply "interested in" a foreign hotel, as opposed to having an "interest in" that hotel. We find Michael's testimony to be implausible and the accountant's testimony to be incredible. Michael does not attempt to muster any justification at all for his failure to report the income earned from the rental of a room in his home. We believe that respondent has provided clear and convincing evidence to support a finding of fraudulent intent with respect to a substantial portion of the underpayment for the years in issue. Accordingly we sustain respondent's determination of fraud against Michael under section 6653(b)(1). b. 6653(b)(2)
Section 6653(b)(2) *604 imposes a separate addition to tax, equal to 50 percent of the interest payable under section 6601, determined on the portion of the underpayment attributable to fraud. Respondent bears the burden of proving the specific portion of the underpayment of tax that is attributable to fraud for purposes of applying the section 6653(b)(2) addition to tax. DiLeo v. Commissioner, supra at 873; Franklin v. Commissioner, T.C. Memo. 1993-184. Since we have concluded already that the full deficiency for each year constituted an underpayment, as that term is used in section 6653(c)(1), we are left to determine the portion of that underpayment that is due to fraud. We conclude that the unreported rental income, the unreported interest on foreign bank accounts, the unreported income from tax refunds and insurance proceeds due CMEM, and the additional unreported income were omitted from income with fraudulent intent. We decline, however, to sustain section 6653(b)(2) additions to tax with respect to the unreported interest income earned on the Theodoulous' domestic accounts and the disallowed deductions for unsubstantiated charitable *605 contributions, since respondent has not met her burden of proving fraud with respect to those items. 2. Substantial Understatement of Liability
Respondent has also determined section 6661 additions to tax against the Theodoulous for their 1982 through 1984 taxable years. For the years in issue, section 6661 imposes an addition to tax equal to 25 percent of the amount of the underpayment attributable to the understatement of income if that understatement was in excess of the greater of $ 5,000 or 10 percent of the tax required to be shown for that year. Petitioners' defense appears to be that any understatement by them was not in excess of the threshold for application of the section 6661 addition. We believe that such threshold has been crossed. We leave the determination of proper additions to tax to the Rule 155 computation. I. Statute of Limitations
As previously noted, petitioners argue that assessment and collection of deficiencies and additions to tax against the Theodoulous for their 1982 through 1984 taxable years is barred by the statute of limitations. Nevertheless, section 6501(c)(1) provides that the normal statute of limitations will be inapplicable *606 where fraudulent returns are concerned. In view of our finding of fraud against Michael for all of the years in issue, we hold that the statute of limitations does not protect the Theodoulous from the deficiencies and additions to tax sustained against them for their 1982 through 1984 taxable years. [18]
J. Innocent Spouse
As a general rule, where a husband and wife file a joint tax return, the appropriate tax is computed with respect to their aggregate income and the resulting tax liability is joint and several. Sec. 6013(d)(3). Petitioners, however, argue that Evangelia should be relieved of her tax liability for the years in issue since she was an innocent spouse within the meaning of section 6013(e). In order to qualify Evangelia for relief as an innocent spouse, petitioners *607 must establish: (A) A joint return has been made under this section for a taxable year, (B) on such return there is a substantial understatement of tax attributable to grossly erroneous items of one spouse, (C) the other spouse establishes that in signing the return he or she did not know, and had no reason to know, that there was such substantial understatement, and (D) taking into account all the facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such substantial understatement. Sec. 6013(e). Petitioners bear the burden of proving Evangelia's entitlement to relief as an innocent spouse under section 6013(e). Rule 142(a). Since we are not persuaded that Evangelia meets the requirement of section 6013(e) (1)(D), we need not consider the other requirements of the section. Section 6013(e)(1)(D) provides that "taking into account all the facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such substantial understatement". In determining whether it would be inequitable to hold Evangelia liable under section *608 6013(e)(1)(D), we consider all of the facts and circumstances. Hayman v. Commissioner, 992 F.2d 1256 (2d. Cir. 1993), affg. T.C. Memo. 1992-228; Estate of Krock v. Commissioner, 93 T.C. 672, 677 (1989). The regulations provide that, in making such a determination, a factor to be considered is whether the person seeking relief significantly benefited, directly or indirectly, from the understatement of income other than through normal support. [19]Sec. 1.6013-5(b), Income Tax Regs. Moreover, evidence of direct or indirect benefit may consist of transfers of property. Id.
We find *609 that Evangelia did indeed benefit from the unreported income since, during the years in issue, over $ 160,000 was deposited into accounts in her name at NSB as follows: Table 29
Year
Account No.
Amount
1982
03-438351
$ 47,842 1983
03-439702
24,549
03-440526
25,025
1984
03-441268
65,001
509766
1,125
Total  $ 163,542
Further, $ 205,626 in 1983, and $ 261,846 in 1984, were wire transferred to Evangelia's jointly held savings and CD accounts in Greece, such amounts later to be used for renovation of the hotel to which she and Michael held joint title. Section 1.6013-5(b), Income Tax Regs., states that transfers of property may constitute evidence of a direct or indirect benefit. In a previous case, we have held that co-ownership of bank deposits and other property represented a disqualifying benefit to the taxpayer seeking innocent spouse treatment. Purificato v. Commissioner, T.C. Memo. 1992-580. In the instant case, Michael clearly had the dominant voice in the Theodoulous' family and business affairs. Nevertheless, Evangelia benefited both directly and indirectly from the unreported income here in issue. In a *610 different context (children's interest income), petitioners themselves argue that, pursuant to Cypriot tradition, Michael felt obligated to put money aside for his family. Not only was Evangelia accorded ownership, either individually or jointly, of substantial assets, but she reaped the more general benefits that arose from the increasing prosperity of the Theodoulous. Moreover, to hold otherwise, conceivably could make it possible for the Theodoulous to shelter present and future assets from collection by respondent through holding those assets in Evangelia's name. Given all of the facts and circumstances before us, we believe that Evangelia experienced significant benefits, of both a direct and indirect nature, and that it is not inequitable to hold her liable for the unreported income attributable to Michael's activities. Accordingly, we conclude that Evangelia is not entitled to innocent spouse relief within the meaning of section 6013. III. CMEM
A. Unreported Net Sales
1. Introduction
On the strength of her determinations that the Theodoulous received additional unreported income (in total, approximately $ 890,000), arrived at through her application *611 of the bank deposits and cash expenditures method, respondent made similar determinations against CMEM. Noting that Michael had complete control over the Golden Dove's financial operations, and arguing that CMEM was Michael's principal means of generating income, respondent identified CMEM as the "likely source" of the Theodoulous' unreported income. She then charged CMEM with unreported net sales in an amount roughly equal to the additional income determined against the Theodoulous through the use of the bank deposits and cash expenditures method for reconstructing income. We have found that the Theodoulous had additional unreported income, not of approximately $ 890,000, as determined by respondent, but of $ 347,399, broken down as follows: Table 30
Year
Unreported Income
1982
0  1983
$ 34,818 1984
312,581
Total  $ 347,399
For the reasons explained below, we also have found that unreported net sales from CMEM constituted the source of that income. Those unreported net sales are as follows: [20]
Table 31
Year
Net Sales
1982
0  1983
$ 26,114 1984
243,140
1985
78,145
Total  $ 347,399
*612 2. Golden Dove as Likely Source of Theodoulous' Unreported Income
As a threshold matter, we are convinced that the likely source of the Theodoulous' unreported income, as identified by the bank deposits and cash expenditures method of reconstructing income, after taking into account the adjustments we have made, was the Golden Dove, the diner operated by CMEM. Michael owned CMEM, which owned the diner. Michael worked extremely long hours at the Golden Dove and simply had no time or expertise to develop any other substantial sources of income beyond those already considered, e.g., the hotel in Cyprus. Moreover, except to the extent we have discussed in analyzing Michael's unreported income, petitioners have offered no other possible source for the deposits and expenditures in question. Unless (and to the extent) petitioners can show that the diner was incapable of generating the unexplained deposits and expenditures in question, the diner presents itself as a logical source of such funds, and respondent has satisfied any burden that she might have to show a likely source for the unexplained bank deposits and cash expenditures in question. Holland v. Commissioner, 348 U.S. 121, 138 (1954). *613 Petitioners, however, argue that the Golden Dove, despite the circumstance that it was Michael's principal source of income, was not the likely source of the unexplained bank deposits and cash expenditures. They contend that the Golden Dove could not possibly have generated the high level of gross sales needed to yield the unreported net sales necessary to account for the income reconstructed by respondent. Specifically, petitioners refer to their expert witness report of Paul Andris (Andris), and argue that, using industry standards for variable and payroll costs, gross sales in excess of the capacity of the diner would be required to explain the additional income. a. Capacity of the Golden Dove
The first aspect of petitioners' argument centers on the Golden Dove's alleged incapacity to produce gross sales of an amount consistent with its status as the likely source of the unexplained income in issue. We have no direct evidence of the weekly sales capacity of the Golden Dove during the years in question. Nevertheless, Michael's testimony gives us a basis to determine such amounts. Michael testified that, in the early 1990s (1990 and 1991), the Golden Dove produced gross *614 sales in the range of $ 26,000 to $ 29,000 per week. Thus, the Golden Dove clearly had the physical capacity to generate at least $ 29,000 a week of gross sales in 1990 or 1991. Finding no evidence in the record to indicate that the Diner's physical capacity changed between those years and the years in issue, we shall assume that, after adjusting for inflation, the diner had an equivalent physical capacity to generate sales during the years in issue. After making appropriate adjustments for inflation, we find, based on an extrapolation from Michael's own testimony, that, during the CMEM's taxable years in issue, the Golden Dove had the capacity to produce weekly gross sales as follows: [21]
Table 32
Year
Capacity
1983
$ 22,137
1984
23,016
1985
23,967
*615 b. The Golden Dove's Contribution Margin[22]
The second aspect of petitioners' attempt to defeat respondent's showing of the Golden Dove as a likely source for the Theodoulous' unreported income involves the appropriate contribution margin to be applied in determining the maximum net sales that could have been generated from the gross sales of the Golden Dove during the years in issue. In arriving at the figures for average weekly gross sales needed to account for the Theodoulous' unreported *616 income (section III.A.2.c., infra), we have undertaken our computations using the Golden Dove's actual contribution margins applicable to its reported sales for each of the years in issue (as determined by petitioners' expert witness, Andris). Table 33
Table 33
Year
Contribution Margin
1982
53 percent
1983
51 percent
1984
51 percent
1985
56 percent
Petitioners, however, argue that, in undertaking our additional gross sales computation, we should not use these contribution margins. Instead, they would have us apply the much lower industry average contribution margin of 34 percent identified by Andris. At trial, Andris testified that, in his experience, although economies of scale, such as those employed by the Theodoulous, could increase a diner's contribution margin where relatively low levels of gross receipts were involved ($ 8,000 to $ 10,000 per week), as gross receipts increased, so did the applicability of the industry average contribution margin. Thus, he posited that, as the gross receipts of the Golden Dove exceeded $ 8,000 to $ 10,000 per week, the costs of producing those sales increased disproportionately, causing the contribution margin *617 to decrease. We are convinced, however, by neither Andris' testimony nor petitioners' argument regarding the properly applicable contribution margin. As we have found, the Golden Dove reported average weekly gross sales as follows: Table 34
Year
Gross Sales
1983
$ 14,292
1984
12,880
1985
15,471
The average of those amounts ($ 14,214) exceeds, by over 40 percent, the ceiling ($ 10,000) identified by Andris as the point beyond which the industry average contribution margin should begin to hold sway. Thus, if Andris is to be believed, such high levels of sales should have significantly reduced the Golden Dove's contribution margin in accordance with the industry average. Nevertheless, the Golden Dove consistently maintained a profit margin in excess of 50 percent for all of the years in issue. In fact, the Golden Dove's highest contribution margin (56 percent) was achieved in the same year (1985) in which it reported its highest average weekly gross sales ($ 15,471). The anticipated decrease in contribution margin as sales went up, suggested by Andris, is not apparent from the data in front of us. Thus, there simply is no basis for applying the industry *618 average contribution margin, as urged by petitioners and their expert, to the Golden Dove during the years in issue. The record provides ample proof of the uniquely profitable fashion in which the Golden Dove was operated. Accordingly, we believe it more accurate to base our projections on the diner's demonstrated performance, rather than on a generalized industry average. [23]
*619 c. Capacity of Golden Dove to Stand as Likely Source
In accordance with the forgoing, the Golden Dove, in order to have generated the unreported net sales attributed to it, as the likely source of the Theodoulous' unreported income, would need to have produced average weekly gross sales as follows: [24]
Table 35
Year
Sales
1983
$ 15,277
1984
22,048
1985
18,155
Our findings (section III.A.2.a. and b., supra) make clear that the production of such weekly gross sales was within the Golden Dove's capacity for each of the years in issue. *620 Table 36
Amount Needed to Support Finding
Year
Capacity
of CMEM as Likely Source
1983
$ 21,127
$ 15,277
1984
22,294
22,048
1985
23,288
18,155
Accordingly, we are convinced that gross sales in the amounts necessary to have generated the unreported income determined against the Theodoulous were not beyond the realm of reasonable possibility for the Golden Dove. Thus, respondent prevails in her argument that the Golden Dove was indeed the likely source of the unexplained income determined via our adjusted income reconstruction. We therefore find that CMEM had unreported net sales for its taxable years 1982 through 1985 in the amounts of zero, $ 26,114, $ 243,140, and $ 78,145, respectively. B. Rental Deductions
Respondent also disallowed CMEM's claimed expenses for rent as follows: Table 37
Year
Amount
1982
$ 33,000
1983
34,500
1984
37,500
1985
15,000
In her notice of deficiency with respect to CMEM's 1982 and 1983 taxable years, respondent disallowed the rental deductions on the grounds that the leasehold, on the basis of which the deductions were claimed, did not have a determinable life. She disallowed those deductions *621 for CMEM's 1984 and 1985 taxable years, however, on the theory that petitioners did not establish that the rents were ever actually paid. On brief, respondent added as a reason for disallowing the rental deductions for 1983 that the claimed amount was not paid. Where the rental deductions for CMEM's 1982 and 1983 taxable years are concerned, we have found as a fact that the lease arrangement in question was for a term of 35 years. Accordingly, respondent's argument that the rental deductions for CMEM's 1982 and 1983 taxable years should be disallowed on the grounds that the leasehold had an indeterminable life simply has no merit. We have found that rental payments were in fact made from CMEM to Michael during CMEM's 1983 through 1985 taxable years. We reject respondent's broad argument that, since CMEM's financial records did not indicate the payment of rent, the claimed payments were never actually made. Respondent contends that because CMEM cannot substantiate the claimed payments, all rental deductions must be disallowed. Michael's credible testimony, combined with the circumstance that the rent in question was reported by him as income, while correspondingly taken as deductions *622 by CMEM, convinces us that the amounts in question legitimately were received by Michael and paid by CMEM. Given the close relationship between Michael's finances and those of the Golden Dove, it is not the least bit surprising that dispositive financial records on that score are lacking. Thus, we are convinced that rental payments were made by CMEM to Michael during taxable years 1983 through 1985. On brief, respondent raised an issue regarding the proper amortization deduction for CMEM's 1982 taxable year, pursuant to Income Tax Reg. 1.162-11. [25] That issue constitutes a new matter, for which petitioners were unprepared at trial. The burden of proof therefore is on respondent. Rule 142(a). The information required to make such a determination, however, has not been placed before this Court, and we decline to do respondent's work for her. Accordingly, we uphold CMEM's claimed deductions for its 1982 through 1985 taxable years. *623 C. Unreported Vending Machine Commissions
As we have found, during the years in issue, various vending machines were installed and operated on the premises of the Golden Dove by La Morte's Cigarette and Music Service, Inc. (La Morte's), which paid a commission based on a percentage of the vending machine receipts. In 1982, Michael received a $ 15,000 interest-free loan from La Morte's. That loan was then repaid by CMEM directly out of the commissions earned on the vending machines during the period from November 12, 1982, through May 6, 1983. By her posttrial amended answer, respondent contends that the $ 15,000 of vending machine commissions used to satisfy the loan from La Morte's to Michael were never reported by CMEM and constitute additional unreported income for CMEM's 1983 taxable year. Respondent bears the burden of proof on that new matter. Rule 142(a) Petitioners contend that respondent has failed to carry her burden since she does not conclusively establish whether the commissions used to repay the loan actually were owed by La Morte's to Michael, on the one hand, or to CMEM, on the other hand. Moreover, they argue that, even if the commissions had been paid *624 to CMEM, respondent does not establish that the amounts were not reported as taxable income by CMEM in its 1983 taxable year. As a threshold matter, we are convinced that CMEM was the proper recipient of the vending machine commissions in issue. Common sense dictates that La Morte's normally would pay commissions from its vending machines to the owner of the premises on which the vending machines were placed. La Morte's first installed vending machines at the Golden Dove in 1981, the year before Michael purchased the land underlying the leasehold. As the legal owner of the Golden Dove, only CMEM had the right to grant La Morte's the space to install vending machines and, as the owner of that space, it must logically have been CMEM to which the commissions were paid. As with the other new matters asserted by respondent, petitioners rely unduly on respondent's burden of proof. We decline to play a shell game; we do not accept petitioners' specious contention that, since the commissions may have accrued to either CMEM or Michael, and since respondent does not conclusively prove which, the determination can be sustained against neither. Respondent has determined, and petitioners *625 concede, that commissions were paid. Logic indicates that those commissions properly were attributable to CMEM. Evidence in support of that conclusion is the location of the vending machines on the premises of CMEM. We believe that such a showing is sufficient for respondent to carry her burden in the absence of any contrary evidence put forth by petitioners. Since they decline to come forward with any evidence that the commissions were actually attributable to Michael, or some third party, we have found that they were paid to CMEM. Similarly, we find that respondent has met her burden on the question of whether the commissions were reported as income by CMEM in its 1983 taxable year. Respondent has established the payment of vending machine commissions to CMEM. In addition, she has presented us with the tax returns and financial records of CMEM, both of which are devoid of any indication that the commissions were ever taken into income. Such proofs are sufficient to establish a prima facie case of unreported vending machine commissions against CMEM. Given petitioners' failure to submit any evidence tending to show that the commissions were indeed taken into income by CMEM, *626 we sustain respondent's determination against CMEM on that issue. [26]
D. Additions to Tax
1. Section 6653(b)(1) and (2)
Respondent has determined additions to tax for fraud under section 6653(b)(1) and (2) against CMEM for all of the years in issue. As previously noted, to prevail under section 6653(b)(1), respondent must show both: (1) That the taxpayer has underpaid his taxes for each year, and (2) that some part of the underpayment is due to fraud. Section 6653(b)(2) then imposes a separate addition to tax, equal to 50 percent of the interest payable under *627 section 6601, determined on the portion of the underpayment attributable to fraud. Respondent has clearly and convincingly proven the existence of an underpayment by CMEM for its 1983 through 1985 taxable years. [27] Given the facts of the instant case, Michael and CMEM are indistinguishable when it comes to establishing the intent element required for a finding of fraud. Thus, for the reasons enumerated in section II.H.1., where we found that Michael possessed fraudulent intent, we here find that CMEM acted willfully to avoid taxes known to be owing. Moreover, we find that the totality of CMEM's underpayment for its 1983 through 1985 taxable years was directly attributable to fraud. Accordingly, we sustain respondent's section 6653(b)(1) and (2) additions to tax for fraud against CMEM for its 1983 through 1985 taxable years. 2. Section 6661
Respondent has also determined section 6661 *628 additions to tax against CMEM for its 1983 through 1985 taxable years. For the years in issue, section 6661 imposes an addition to tax equal to 25 percent of the amount of the underpayment attributable to the understatement of income if that understatement was in excess of the greater of $ 5,000 or 10 percent of the tax required to be shown for that year. CMEM substantially underreported its liability for each of its 1983 through 1985 taxable years. Accordingly, we sustain respondent's section 6661 additions to tax for those years. E. Statute of Limitations
Petitioners argue that assessment and collection of deficiencies and additions to tax against CMEM for its 1982 and 1983 taxable years are barred by the statute of limitations. Nevertheless, section 6501(c)(1) provides that the normal statute of limitations will be inapplicable where fraudulent returns are concerned. In view of our finding of fraud against CMEM for its 1983 through 1985 taxable years, we must also find that the statute of limitations does not protect CMEM from the deficiencies and additions to tax sustained against it for its 1983 taxable year. [28]
*629 An appropriate order will be issued. APPENDIX
[1]
METHODOLOGY
This appendix was developed from the stipulations of the parties, an expert witness report filed by petitioners, and various source documents in the record. We began with a summary of account activity furnished by petitioners' expert witness. We then compared that summary to information available in the stipulations to confirm its accuracy. Finally, we considered the validity of the annotations made with respect to each account by petitioners' expert. Verification was accomplished by tracing each explanation to a source document, such as a deposit slip, in the record. Where information in the record differed from petitioners' annotations, appropriate adjustments were made in accordance with the available evidence. A key to abbreviations is at the end of the appendix. NORTHFIELD SAVINGS BANK (NSB) ACCOUNT ACTIVITY
1982 - 1984
ACCOUNT NO. 03-437172 -- 1982
Date
Deposit
Withdrawal
Source/Disposition
01/06/82
$ 14,000
$ 5,000 TT AC 438176 -- D on 02/05/82  5,000
TT AC 438351 -- D on 02/05/82  4,000
TT AC 438175 -- D on 02/05/82  01/07/82
15,000
15,000
check  01/18/82
12,914
10,887
TT AC 438417 -- D on 02/16/82  1,600
TT AC 438417 -- D on 02/18/82  185
TT AC 438351 -- D on 03/03/82  242
TT AC 438175 -- D on 02/05/82  $ 41,914
*630 ACCOUNT NO. 03-438175 -- 1982
Date
Deposit
Withdrawal
Source/Disposition
01/06/82
$ 100  $ 100  unexplained  01/15/82
16
16
unexplained  01/30/82
5,468
5,468
TF HSB AC **  02/05/82
5,010
4,000
TF AC 437172 -- WD on 01/06/82  242
TF AC 437172 -- WD on 01/18/82  768
unexplained ##  04/13/82
5,000
5,000
unexplained  07/12/82
9,000
9,000
unexplained  10/16/82
$ 25,509
25,509
check  $ 24,594
$ 25,509
ACCOUNT NO. 03-438176 -- 1982
Date
Deposit
Withdrawal
Source/Disposition
01/30/82
$ 5,300 $ 5,300 TF HSB AC **  02/05/82
5,000
5,000
TF AC 437172 -- WD on 01/06/82  04/13/82
5,000
5,000
unexplained  04/13/82
1,000
1,000
unexplained  07/12/82
8,000
8,000
unexplained  10/16/82
$ 25,050
25,050
check  $ 24,300
$ 25,050
ACCOUNT NO. 03-438351 -- 1982
Date
Deposit
Withdrawal
Source/Disposition
01/26/82
$ 22,217
$ 22,217
TF HSB AC **  02/05/82
5,000
5,000
TF AC 437172 -- WD on 01/06/82  03/03/82
500
185
TF AC 437172 -- WD on 01/18/82  315
unexplained  03/08/82
1,000
1,000
unexplained  03/17/82
400
400
unexplained  04/13/82
1,000
1,000
unexplained  04/29/82
1,000
1,000
unexplained  06/19/82
225
225
unexplained  07/09/82
5,000
5,000
unexplained  07/12/82
9,000
9,000
unexplained  07/15/82
2,500
$ 2,500 2,500
redeposit from WD on same day  10/19/82
35,000
20,000
TT AC 439458 -- D on 10/21/82  15,000
cash -- uncertain  10/19/82
10,424
10,424
cash -- uncertain  $ 47,842
$ 47,924
*631 ACCOUNT NO. 03-438417 -- 1982
Date
Deposit
Withdrawal
Source/Disposition
02/16/82
$ 10,887 $ 10,887
TF AC 437172 -- WD on 01/18/82  02/18/82
5,006
1,600
TF AC 437172 -- WD on 01/18/82  3,406
unexplained  03/20/82
$ 4,000 4,000
check  04/07/82
135
135
unexplained  04/13/82
5,000
5,000
unexplained  04/30/82
6,291
5,291
tax refund -- CMEM  1,000
unexplained  04/30/82
1,750
1,750
unexplained  05/03/82
9,970
9,970
unexplained  05/11/82
5,000
5,000
unexplained  07/09/82
5,000
5,000
unexplained  07/12/82
9,000
9,000
unexplained  07/22/82
10,000
10
redeposit on 07/22/82  4,000
redeposit on 07/28/82  4,500
redeposit on 08/16/82  1,490
redeposit on 08/23/82  07/26/82
20
10
redeposit from WD on 07/22/82  10
unexplained  07/28/82
19,000
4,000
redeposit from WD on 07/22/82  15,000
loan from Coffee Associates on  07/26/82 08/03/82
6,000
5,510
redeposit on 08/23/82  90
cash -- uncertain  08/10/82
6,000
6,000
unexplained  08/16/82
4,500
4,500
redeposit from 07/22/82  08/23/82
7,000
1,490
redeposit from 07/22/82  5,510
redeposit from 08/03/82  08/26/82
4,000
4,000
cash -- uncertain  09/24/82
14,649
14,649
insurance proceeds  10/19/82
86,497
15,000
check  5,000
TT AC 439458 -- D on 10/24/82  5,000
TT AC 439458 -- D on 10/24/82  13,000
TT AC 439458 -- D on 10/28/82  7,000
TT AC 439458 -- D on 11/01/82  10,000
TT AC 439459 -- D on 11/05/82  31,497
cash -- uncertain  $ 109,073
$ 110,632
*632 ACCOUNT NO. 03-439283 -- 1983/1984
Date
Deposit
Withdrawal
Source/Disposition
03/08/83
$ 180   $ 180   unexplained  03/26/83
80
80
unexplained  04/14/83
500
500
unexplained  07/12/83
10,000
10,000
unexplained  10/06/83
7,500
7,500
unexplained  10/17/83
8,736
8,736
unexplained  12/13/83
5,000
5,000
unexplained  12/19/83
5,000
5,000
unexplained  01/06/84
10,000
10,000
unexplained  03/20/84
$ 47,862
47,262
TT foreign account  300
TT AC 441268 -- D on 04/02/84  300
TT AC 441268 -- D on 04/13/84  $ 46,996
$ 47,862
ACCOUNT NO. 03-439458 -- 1982/1983
Date
Deposit
Withdrawal
Source/Disposition
10/21/82
$ 20,000 $ 20,000 TF AC 438351 -- WD on 10/19/82 **
10/25/82
5,000
5,000
TF AC 438417 -- WD on 10/19/82
10/26/82
5,000
5,000
TF AC 438417 -- WD on 10/19/82
10/28/82
13,000
13,000
TF AC 438417 -- WD on 10/19/82
11/01/82
7,000
7,000
TF AC 438417 -- WD on 10/19/82
11/15/82
10,000
10,000
TF AC 438417 -- WD on 10/19/82
03/25/83
1,410
1,410
exchange-Diner -- unexplained ##
03/25/83
$ 17,000 17,000
taxes  04/02/83
5,000
5,000
exchange-Diner -- unexplained ##
04/04/83
8,500
8,500
exchange-Diner -- unexplained ##
04/12/83
5,000
2,090
exchange-Diner -- unexplained ##
2,910
unexplained
04/15/83
3,850
3,850
unexplained
04/16/83
2,500
2,500
unexplained
04/18/83
9,350
9,350
unexplained
04/21/83
5,000
5,000
redeposit on 04/25/83
04/25/83
5,000
5,000
redeposit from 04/21/83
05/16/83
13,000
13,000
unexplained
05/16/83
10
10
unexplained
05/19/83
2,000
2,000
unexplained
05/23/83
5,000
5,000
unexplained
06/13/83
8,250
8,250
unexplained
06/14/83
5,000
5,000
loan from Antonios Antoniou **
06/21/83
3,283
3,283
redeposit on 06/27/83
06/27/83
15,000
3,283
redeposit from 06/21/83
11,717
unexplained
09/15/83
5,000
5,000
unexplained
09/30/83
133,040
133,040
TT foreign account
$ 153,870
$ 158,323
*633 ACCOUNT NO. 03-439284 -- 1983/1984
Date
Deposit
Withdrawal
Source/Disposition
01/22/83
$ 150   $ 150 unexplained  04/16/83
200
200
unexplained  06/28/83
$ 100 100
redeposit on 07/01/83  07/01/83
110
100
redeposit from 06/28/83  10
unexplained  07/11/83
10,000
10,000
unexplained  10/06/83
7,500
7,500
unexplained  10/17/83
9,300
9,300
unexplained  12/13/83
5,000
5,000
unexplained  12/19/83
5,000
5,000
unexplained  01/06/84
10,000
10,000
unexplained  01/17/84
11,000
11,000
check  03/20/84
36,870
36,870
TT foreign account  03/30/84
493
493
unexplained  $ 47,260
$ 48,463
ACCOUNT NO. 03-439702 -- 1983
Date
Deposit
Withdrawal
Source/Disposition
01/05/83
$ 5,049 $ 4,349 escrow refund **  700
unexplained  06/04/83
9,500
9,500
unexplained  07/11/83
10,000
10,000
unexplained  09/30/83
$ 25,061
25,061
TT foreign account  $ 24,549
$ 25,061
ACCOUNT NO. 03-440526 -- 1983
Date
Deposit
Withdrawal
Source/Disposition
08/15/83
$ 10    $ 10  unexplained  08/16/83
850
850
unexplained  08/17/83
2,000
335
exchange-Diner--unexplained ##  1,665
unexplained  08/18/83
2,600
2,600
exchange-Diner--unexplained ##  08/19/83
3,300
3,300
exchange-Diner--unexplained ##  08/20/83
5,765
5,765
exchange-Diner--unexplained ##  08/22/83
10,500
10,500
unexplained  08/23/83
$ 12,000
12,000
to Golden Dove  09/17/83
13,025
13,025
cash -- uncertain  $ 25,025
$ 25,025
*634 ACCOUNT NO. 03-441268 -- 1984
Date
Deposit
Withdrawal
Source/Disposition
04/02/84
$ 300   $ 300   TF AC 439283 -- WD on 03/30/84  04/12/84
5,500
5,500
unexplained  04/13/84
4,000
300
TF AC 439283 -- WD on 03/30/84  3,700
unexplained  04/14/84
7,000
7,000
unexplained  04/16/84
10,000
10,000
unexplained  04/20/84
6,401
6,401
unexplained  04/21/84
6,000
4,000
exchange-Diner--unexplained ##  2,000
unexplained  04/27/84
3,000
3,000
exchange-Diner--unexplained ##  04/28/84
4,000
4,000
exchange-Diner--unexplained ##  04/30/84
$ 11,000
11,000
to Golden Dove  05/08/84
9,800
9,800
unexplained  05/14/84
9,000
9,000
unexplained  05/29/84
54,001
54,001
TT AC 441391 -- D on 05/29/84  $ 65,001
$ 65,001
ACCOUNT NO. 03-441391 -- 1984
Date
Deposit
Withdrawal
Source/Disposition
05/14/84
$ 10,000 $ 10,000 unexplained  05/21/84
9,500
9,500
unexplained  05/26/84
8,500
8,500
unexplained  05/29/84
54,001
54,001
TF AC 441268--WD on 05/29/84 **  06/16/84
8,500
8,500
unexplained  06/22/84
6,500
6,500
unexplained  07/16/84
5,047
5,047
unexplained  07/13/84
$ 102,529
102,529
TT foreign account  $ 102,048
$ 102,529
*635 ACCOUNT NO. 03-441537 -- 1984
Date
Deposit
Withdrawal
Source/Disposition
07/03/84
$ 6,500 $ 6,500 unexplained  07/05/84
9,000
9,000
unexplained  07/07/84
11,000
11,000
unexplained  07/09/84
11,000
11,000
unexplained  07/10/84
3,500
3,500
unexplained  07/12/84
4,000
933
exchange-Diner--unexplained ##  3,067
unexplained  07/13/84
4,000
4,000
exchange-Diner--unexplained ##  07/14/84
2,000
2,000
exchange-Diner--unexplained ##  07/20/84
$ 6,933 6,933
check -- diner expenses  07/23/84
11,500
11,500
unexplained  07/31/84
7,000
7,000
deposit unexplained  07/31/84
62,617
62,617
TT foreign account  $ 69,500
$ 69,550
ACCOUNT NO. 03-441693 -- 1984
Date
Deposit
Withdrawal
Source/Disposition
08/11/84
$ 9,950  $ 9,950  unexplained  08/13/84
9,950
9,950
unexplained  08/18/84
9,990
9,990
unexplained  08/24/84
5,103
5,103
unexplained  09/04/84
9,000
9,000
unexplained  09/07/84
5,500
5,500
unexplained  09/09/84
6,000
6,000
unexplained  09/10/84
8,400
8,400
unexplained  10/02/84
2,000
2,000
unexplained  10/13/84
9,311
9,311
unexplained  11/10/84
5,000
5,000
unexplained  12/15/84
9,950
9,950
unexplained  12/17/84
5,000
5,000
unexplained  12/21/84
9,404
9,404
unexplained  12/31/84
6,000
6,000
unexplained  12/31/84
$ 122,058
116,000
TT foreign account  6,058
TT AC 442079 -- D on 12/31/84  $ 110,558
$ 122,058
*636 ACCOUNT NO. 442079 -- 1984
Date
Deposit
Withdrawal
Source/Disposition
12/31/84
$ 6,058
$ 6,058
TF AC 446193--WD on 12/31/84 **  12/31/84
2,132
2,132
unexplained  $ 8,190
ACCOUNT NO. 509765
Date
Deposit
Withdrawal
Source/Disposition
02/28/84
$ 1,125
$ 1,125 unexplained
ACCOUNT NO. 509766
Date
Deposit
Withdrawal
Source/Disposition
02/28/84
$ 1,125
$ 1,125 unexplained
SUMMARY TABLES FOR TRANSFERS/REDEPOSITS
1982
SUMMARY TABLES FOR TRANSFERS/REDEPOSITS
1982
Date
Amount
To Acct. No.
From Acct. No.
01/26 **$ 22,217 438351
HSB AC  01/30 **5,468
438175
HSB AC  01/30 **5,300
438176
HSB AC  02/05
4,000
438175
437172  02/05
242
438175
437172  02/05
5,000
438176
437172  02/05
5,000
438351
437172  02/16
10,887
438417
437172  02/18
1,600
438417
437172  03/03
185
438351
437172  04/30
5,291
438417
Tax refund -- CMEM  07/15
2,500
438351
438351  07/26
10
438417
438417  07/28
4,000
438417
438417  07/28
15,000
438417
Loan -- Coffee Assoc.  08/16
4,500
438417
438417  08/23
1,490
438417
438417  08/23
5,510
438417
438417  09/24
14,649
438417
Insurance proceeds  10/21 **20,000
439458
438351  10/24
5,000
439458
438417  10/24
5,000
439458
438417  10/28
13,000
439458
438417  11/01
7,000
439458
438417  11/15
10,000
439458
438417  $ 172,849
*637 SUMMARY TABLES FOR TRANSFERS/REDEPOSITS
1983
Date
Amount
To Acct. No.
From Acct. No.
04/25
$ 5,000 439458
439458  06/13 **5,000
439458
Loan -- A. Antoniou  06/27
3,283
439458
439458  07/01
100
439284
439284  01/05
4,349
439702
Escrow refund  $ 17,732
SUMMARY TABLES FOR TRANSFERS/REDEPOSITS
1984
Date
Amount
To Acct. No.
From Acct. No.
04/02
$ 300   441268
439283
04/13
300
441268
439283
05/29 **54,001
441391
441268
12/31 **6,058
442079
446193
$ 60,659
TOTAL REDEPOSITS/
TRANSFERS
Year
Amount
1982
$ 172,849
1983
17,732
1984
60,659
$ 251,240
SUMMARY TABLE FOR NET DEPOSITS COMPUTATION
Year
Gross Deposits
Less Redeposits/Transfers
Equals Net Deposits
1982
$ 265,809
($ 172,849)
$ 92,960 1983
217,700
(17,732)   199,968
1984
377,547
(60,659)   316,888
SUMMARY TABLE FOR CASH WITHDRAWALS -- DISPOSITION UNCERTAIN
1982
SUMMARY TABLE FOR CASH WITHDRAWALS --
DISPOSITION UNCERTAIN
1982
Date
Acct. No.
Amount
04/07
438417
$ 135   08/03
438417
90
08/23
438417
4,000
10/19
438351
15,000
10/19
438351
10,424
10/19
438417
31,497
Total
$ 61,146
*638 1983
Date
Acct. No.
Amount
09/17
440526
$ 13,025
Total
$ 13,025
1984
Date
Acct. No.
Amount
03/30
439284
$ 493
Total
$ 493
KEY
** Concession by respondent ## Claimed as transfer or redeposit by petitioners, but not sustained. [2]
For discussion. TF Transfer from TT Transfer to WD Withdrawal D Deposit AC Account number HSB Howard Savings Bank Footnotes
1. Cases of the following petitioners are consolidated herewith: CMEM, Inc., d.b.a. Golden Dove Restaurant, docket No. 1548-89; CMEM, Inc., d.b.a. Golden Dove Diner, Michael and Evangelia Theodoulou, docket No. 13579-89.↩
1. Respondent also determined sec. 6653(b)(2) additions to tax against Michael Theodoulou equal to 50 percent of the interest due on the entire tax deficiency for each year. Respondent determined no sec. 6653(b)↩ additions to tax against Evangelia Theodoulou.
2. Respondent also determined sec. 6653(b)(2) additions to tax against CMEM, Inc., equal to 50 percent of the interest due on the entire tax deficiency for each year except for the taxable year ended Sept. 30, 1984, regarding which respondent determined that sec. 6653(b)(2)↩ additions to tax applied to only $ 143,912.
1. There appears to be some conflict in the record as to ownership of this account. Petitioners' expert witness, Debellis, treated this as Evangelia's and we do also.↩
1. The First Stipulation of Facts indicates the name of Eleada alone is on these numbered accounts, but bank records indicate otherwise.↩
2. Tables 11, 12, and 13 enumerate those cashier's checks that petitioners have failed to link with specific nontaxable sources. Those entries denoted by the * symbol indicate cashier's checks of which only a portion, rather than the full amount, was not specifically linked to a nontaxable source.↩
3. The purchase amount listed reflects purchase price less trade-in allowance.↩
1. The Cadillac Coupe de Ville was purchased by Michael on behalf of his nephew, Teddy Mijailidis using funds held by Michael for Mijailidis. See finding 14, supra.↩
2. We have accepted respondent's proposed finding of fact in this amount, which is $ 275 less than the amount we derive from the amounts stipulated.↩
4. For each of the years in issue, the Theodoulous understated items of gross income or overstated deductions as follows: ↩
Item
1982
1983
1984
Gross rental income
$ 22,458
$ 20,820
$ 19,240 Interest on foreign
accounts 0  4,706
36,130
Interest on domestic
accounts 1,381
1,528
970
Tax refunds and insurance
proceeds 19,940
0  0  Other unreported
income 0  34,818
312,581
Charitable contributions
0  492
1,780
Total  $ 43,779
$ 62,364
$ 370,701
5. For each of the years in issue, CMEM understated items of gross income as follows: ↩
Item
1982
1983
1984
1985
Net sales
0  $ 26,114
$ 243,140
$ 78,145
Vending
machine commissions 0  15,000
0  0  Total  0  $ 41,114
$ 243,140
$ 78,145
6. Using data published by the International Monetary Fund, respondent determined that the average U.S. interest rates on interest bearing accounts were 9.09 percent for 1983, and 10.37 percent for 1984. The average rates paid on like accounts in Greece were 14.5 percent in 1983 and 15.42 percent in 1984. The interest paid on deposits in Cyprus was 5.75 percent for both 1983 and 1984. At trial, respondent asked this Court to take judicial notice of selected interest rate compilations published by the International Monetary Fund regarding average rates in the U.S., Cyprus, and Greece. Petitioners oppose such judicial notice, apparently for fear that inherent in such notice would be a finding that the Theodoulou family earned such amounts on their deposits.
The interest rate compilations published by the International Monetary Fund, however, constitute appropriate matter for judicial notice under sec. 201(b) of the Federal Rules of Evidence. Those rates are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned". Fed. R. Evid. 201(b)(2). Accordingly, we take judicial notice of the selected interest rate compilations published by the International Monetary Fund regarding average rates in the U.S., Cyprus, and Greece. Taking such judicial notice, however, is not to suggest a finding that respondent's interest rate determinations made with reference to those data are necessarily accurate or that those computations reflect the interest income actually earned by the Theodoulous.↩
7. Although in her statutory notice respondent determined omitted interest income for 1982 of $ 1,565, on brief she requests a finding of omitted interest income for 1982 of $ 1,381. We assume that respondent concedes the difference and have not considered finding omitted interest income for 1982 in excess of $ 1,381.↩
8. It is unclear from the record why the omitted interest for 1984 ($ 970) is less than the interest earned by the children for that year ($ 1,043, see table 7, supra↩). The difficulty may lie in the fact that petitioners' 1984 return simply reports interest of $ 2,055 from NSB without any detail.
9. See sec. II.E.4., infra↩.
10. In her statutory notice and amended answer, respondent determined constructive dividends against the Theodoulous for their 1982 through 1984 taxable years in slightly greater amounts than those that she sought, on brief, to have established as a finding of fact. We take the difference to be a concession on the part of respondent and proceed according to the numbers she put forth in her requested ultimate finding of fact.↩
11. Although the Theodoulous may have made cash expenditures in other than the categories indicated, respondent has, on brief, taken into account only those categories in making her bank deposits and cash expenditures analysis. We will do likewise.↩
12. In calculating the transfers and redeposits here in issue, the parties also labeled as "transfers" certain items that were deposited from nontaxable sources, e.g., a loan and the refund of an amount previously placed in escrow. We will not reclassify such amounts.↩
13. All other expenditures made from withdrawn funds have been traced and identified. See appendix.↩
14. We do not consider the Theodoulous' foreign accounts in our available funds analysis since the amounts placed in those accounts and the interest earned thereon remained abroad until after the years in issue.↩
15. Petitioners are given credit for the $ 15,000 loan from Coffee Associates by our treating it as a transfer or redeposit of previously deposited funds. See sec. II.E.1.e.↩
16. All of the items considered in determining available funds for each of the years in issue are either nontaxable, previously taxed, or currently taxable as a result of our previous findings in this opinion.↩
17. The same amount ($ 5,900) was projected as living expenses by respondent for each of the years in issue.↩
1. As explained in sec. II.E.2.b., the cash-on-hand figure for 1983 was derived by subtracting the unreported income determined for 1982 from the amount of cash withdrawals made during that year, the disposition of which was unknown.↩
18. We note that the period of limitations also would have been extended pursuant to sec. 6501(e)↩ since the Theodoulous omitted amounts in excess of 25 percent of the amounts reported as gross income for each of the years in issue.
19. Although sec. 6013(e) was amended after sec. 1.6013-5(b), Income Tax Regs., was promulgated, whether a spouse significantly benefited from the erroneous item is still a factor to be considered in determining whether it is inequitable to hold a spouse liable. Winnett v. Commissioner, 96 T.C. 802, 813↩ n.7 (1991).
20. In determining the unreported net sales of CMEM, appropriate adjustments have been made to take account of the variance between the Theodoulous' calendar tax year and CMEM's tax year ended Sept. 30. For instance, the Theodoulous had $ 34,818 of additional unreported income in 1983. Only three-fourths of that amount, however (9 months over 12 months) is attributable to CMEM's tax year ending Sept. 30, 1983. The remaining one-fourth is attributable to the first quarter of CMEM's tax year ended Sept. 30, 1984. A similar adjustment has been made in allocating the Theodoulous' additional unreported income for their 1984 calendar year to CMEM's 1984 and 1985 fiscal years.↩
21. Our calculations follow the method set forth by petitioners' expert witness, Paul Andris, in his expert witness report (exhibit C of petitioners' exhibit 125). For purposes of examination, we begin discounting for inflation the $ 29,000 of average weekly gross sales ($ 29,000 X 52 weeks = $ 1,508,000 annualized) as of Sept. 30, 1990 (the mid-point of CMEM's 2 fiscal years noted by Michael as the period during which the diner produced up to $ 29,000 per week of gross sales). We then discount for inflation back to the end of each fiscal year under inquiry using the numbers from the Consumer Price Index furnished by petitioners.↩
22. Contribution margin is a term introduced by petitioners' expert, Paul Andris, to denote that portion of a dollar of sales remaining after variable costs for: (1) Raw materials, e.g., meat, fish, or vegetables, and (2) labor are subtracted. Contribution margin can be expressed as a percentage of sales or as an absolute dollar amount. Where expressed as an absolute dollar amount, contribution margin is available to contribute to nonvariable costs or, once such nonvariable costs have been satisfied, to distribute as profit.↩
23. The application of the diner's historical contribution margin is used as a yardstick solely to determine the Golden Dove's capacity for producing the amounts determined via our bank deposits and cash expenditures analysis. As explained in sec. III.A.2., respondent has met her burden of establishing the Golden Dove as the likely source of the unreported income during the years in issue. Thus, it is up to petitioners to establish that, in actuality, the diner could not have produced the amounts in issue. In order to prevail, respondent need not specifically prove the existence of such profits and costs in such proportion with respect to the additional gross sales charged against the Golden Dove. Instead, petitioners must come forward with affirmative evidence establishing that the costs that would be incurred by the Golden Dove in producing the additional gross sales were of a nature to make such production impossible. Petitioners have failed to make such a showing.↩
24. Such amounts are determined using the Golden Dove's actual profit margins for each of the years in issue. See sec. III.A.2.b., supra. Computations are as follows: Step
1983
1984
1985
(1)
$ 26,114
$ 243,140
$ 78,145 (2)
.51  .51  .56  (3)
$ 51,204
$ 476,745
$ 139,545
(4)
52  52  52  985
$ 9,168  $ 2,684  (5)
+14,292
+12,880
+15,471
(6)
$ 15,277
$ 22,048
$ 18,155 Step
(1) Unexplained income determined via income reconstruction (adjusted for CMEM's fiscal years). See table 31, supra. (2) Divided by CMEM's demonstrated contribution margin. (3) Equals additional gross sales needed to have produced unexplained income determined via income reconstruction. (4) Divided by 52 to yield average weekly gross sales. (5) Plus average weekly gross sales reported by CMEM. See table 34, supra. (6) Equals average weekly gross sales needed for CMEM to stand as likely source.↩
25. In relevant part, sec. 1.162-11, Income Tax Regs., states as follows: (a) Acquisition of a leasehold. If a leasehold is acquired for business purposes for a specified sum, the purchaser may take as a deduction in his return an aliquot part of such sum each year, based on the number of years the lease has to run.↩
26. Our finding that Michael's loan from LaMorte's was repaid by CMEM generally would give rise to the inference that Michael received a constructive dividend from CMEM in the amount of the repaid loan ($ 15,000). Nevertheless, respondent did not address that issue in her pleadings nor do we deem that it has been tried by either express or implied consent of the parties. Rule(s) 41(a) and (b)(1). Accordingly, such issue will not be considered.↩
27. As previously discussed, we have not sustained any of respondent's determinations against CMEM for its 1982 taxable year.↩
28. We note that the period of limitations also would have been expanded pursuant to sec. 6501(e)↩ since CMEM omitted amounts in excess of 25 percent of the amounts reported as gross income for its 1983 taxable year.
1. The data in this appendix is incorporated as part of our findings of fact.↩
2. We have not allowed petitioners credit for a claimed redeposit that they have been unable to identify specifically as coming from a previous withdrawal. Petitioners fail to link that deposit, $ 768, to account number 438175 on Feb. 5, 1982, with any withdrawals in evidence from which the deposit plausibly could have had its origin. Given that lack of necessary proof, petitioners claim that the deposit represented a transfer or redeposit is not alone sufficient to prevail on the issue.↩